UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI IN THE
SOUTHWESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil No.  19-5031 |
| vs. | ) | |
| | ) | |
| | ) | **COMPLAINT** |
| DYNO NOBEL, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

The United States of America (United States), by the authority of the Attorney General of

the United States, on behalf of the United States Environmental Protection Agency (EPA),

alleges as follows:

## NATURE OF ACTION

1.      This is a civil action for injunctive relief and penalties brought against Dyno

Nobel, Inc. (Dyno) for violations of the Clean Water Act (CWA), 33 U.S.C. §§ 1311(a) and

1342, and the Resource Conservation and Recovery Act (RCRA), 42 U.S.C. §§ 6922 and 6925.

The United States seeks: 1) injunctive relief to stop Dyno's ongoing violations of the CWA and

RCRA, including discharges of pollutants to waters of the United States in violation of the

relevant National Pollutant Discharge Elimination System (NPDES) permits and the illegal

disposal of hazardous waste, and 2) civil penalties for Defendant's past and ongoing violations of

the CWA and RCRA at its Carthage, Missouri and Louisiana, Missouri facilities.

## JURISDICTION AND VENUE

2. This Court has jurisdiction over the subject matter of this action and over the Defendant pursuant to 28 U.S.C. §§ 1331, 1345, and 1355, 33 U.S.C. § 1319(b), and 42 U.S.C. § 6928.

3. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1395, 33 U.S.C. § 1319(b), and 42 U.S.C. § 6928 because events giving rise to this action arose within this judicial district, and because Defendant owns and operates a facility within this district.

4. Notice of the commencement of this action has been provided to the State of Missouri pursuant to 33 U.S.C. § 1319(b) and 42 U.S.C. § 6928(a)(2).

5. Authority to bring this civil action is vested with the Attorney General of the United States, pursuant to 28 U.S.C. §§ 516 and 519, 33 U.S.C. § 1366, and 42 U.S.C. § 6979b.

## DEFENDANT

6. Defendant Dyno is a Delaware corporation that at all times relevant to this Complaint owned and operated facilities in Carthage, Missouri and Louisiana, Missouri.

7. Dyno is a "person" as defined by 33 U.S.C. § 1362(5) and 42 U.S.C. § 6903(15).

## CWA STATUTORY BACKGROUND

8. The CWA prohibits the discharge of any pollutant by any person except as in compliance with the CWA. 33 U.S.C. § 1311(a).

9. The CWA defines "discharge of a pollutant" as any addition of any pollutant to navigable waters from any point source, 33 U.S.C. § 1362(12); "person" to include corporations, municipalities, and political subdivisions of a State, 33 U.S.C. § 1362(5); "point source" as any discernible, confined and discrete conveyance, including any pipe, ditch or channel, from which pollutants are or may be discharged, 33 U.S.C. § 1362(14); and "navigable waters" as the waters of the United States, 33 U.S.C. § 1362(7).

2

10.     The CWA broadly defines "pollutant" to include "solid waste . . . chemical wastes, biological materials . . . heat . . . and industrial, municipal, and agricultural waste discharged into water."  33 U.S.C. § 1362(6).

11.     Authorized states may issue NPDES permits authorizing discharges of pollutants otherwise prohibited under the CWA.  33 U.S.C. § 1342(b).

12.     At all relevant times, the State of Missouri has been and continues to be authorized by the Administrator of the EPA to implement the NPDES permit program for discharges into navigable waters within its jurisdiction.  33 U.S.C. § 1342(b).

13.     Pursuant to 33 U.S.C. §§ 1319 and 1342(i), EPA retains authority, concurrent with authorized state NPDES programs, to enforce state-issued permits.

14.     Pursuant to 33 U.S.C. §§ 1319(b) and (d), EPA is authorized to bring a civil action seeking appropriate injunctive relief and civil penalties for violations of an NPDES Permit issued by a State.

## RCRA STATUTORY BACKGROUND

15.     Federal regulation of hazardous waste is primarily based on RCRA, which establishes a "cradle to grave" program to be administered by the Administrator of EPA and by authorized states for regulating the generation, transportation, treatment, storage, and disposal of hazardous waste.  See 42 U.S.C. § 6901 et seq.  Pursuant to its authority under RCRA, EPA has promulgated regulations at 40 C.F.R. Parts 260-280 applicable to hazardous waste generators, transporters, and owners and operators of treatment, storage and disposal facilities.

16.     RCRA Section 3006, 42 U.S.C. § 6926, provides that a state may obtain federal authorization to administer the RCRA hazardous waste program in that state.  At all relevant

3

times, the State of Missouri has been and continues to be authorized by the Administrator of the EPA to implement a hazardous waste program under RCRA. 42 U.S.C. § 6926(b).

17.     The requirements of the Missouri hazardous waste program are found in the Missouri Hazardous Waste Management Law, Mo. Rev. Stat. §§ 260.350 to 260.433, and its implementing regulations.

18.     Although the EPA has granted the State authority to enforce its own hazardous waste program, the EPA retains jurisdiction and authority to initiate an independent enforcement action pursuant to 42 U.S.C. § 6928(a)(2), to address violations of the requirements of the authorized state program, upon notification to the State of Missouri.

19.     The State's authorized hazardous waste program operates in lieu of the federal RCRA program, so the United States hereby enforces the state provisions. The State of Missouri enacted many of its regulations by reference to the federal regulations, making the federal citations useful for reference.

20.     Pursuant to 40 C.F.R. § 261.2, as incorporated in the Missouri Code of State Regulations Annotated (Mo. Code Regs. Ann. Tit. 10, § 25-4.261(1)), "solid waste" is defined as any discarded material that is not otherwise excluded under 40 C.F.R. § 261.4(a) or that is not excluded by a variance or by a non-waste determination. A "discarded material" includes any material which is abandoned, recycled, or inherently waste-like. 40 C.F.R. § 261.2(a)(i), as incorporated in Mo. Code Regs. Ann. Tit. 10, § 25-4.261(1).

21.     A solid waste is a hazardous waste if it is not excluded from regulation as a hazardous waste under 40 C.F.R. § 261.4(b), and it exhibits any of the characteristics of hazardous waste identified in Subpart C of 40 C.F.R. Part 261 or it is listed in Subpart D of 40

4

C.F.R. Part 261. <u>See</u> 40 C.F.R. § 261.20, as incorporated in Mo. Code Regs. Ann. Tit. 10, § 25-4.261(1).

22.     Characteristic hazardous wastes are assigned "D" codes in 40 C.F.R. Part 261 Subpart C depending on the specific hazardous characteristic that the waste exhibits.

23.     Pursuant to 40 C.F.R. § 261.24, as incorporated in Mo. Code Regs. Ann. Tit. 10, § 25-4.261(1), a solid waste exhibits the "characteristic of toxicity" and therefore constitutes hazardous waste if it contains any of the contaminants listed in § 261.24 at or above concentrations specified in § 261.24.

24.     Pursuant to 40 C.F.R. § 261.24, as incorporated in Mo. Code Regs. Ann. Tit. 10, § 25-4.261(1), lead is a contaminant that has been assigned the EPA hazardous waste number D008, and a solid waste constitutes a hazardous waste if the lead concentration in the waste equals or exceeds 5.0 mg/L, when using the sampling method specified in the regulation.

25.     Pursuant to 40 C.F.R. § 261.21(a)(4), as incorporated in Mo. Code Regs. Ann. Tit. 10, § 25-4.261(1), a solid waste exhibits the "characteristic of ignitability" and therefore constitutes hazardous waste if it is an oxidizer, including but not limited to a "nitrate."

26.     Pursuant to 40 C.F.R. § 261.23, as incorporated in Mo. Code Regs. Ann. Tit. 10, § 25-4.261(1), a solid waste exhibits the "characteristic of reactivity" and therefore constitutes hazardous waste if it has any of the listed properties including: "(6) [i]t is capable of detonation or explosive reaction if it is subjected to a strong initiating source or if heated under confinement."

27.     Pursuant to 40 C.F.R. § 261.21(a)(4) and 261.23, as incorporated in Mo. Code Regs. Ann. Tit. 10, § 25-4.261(1), ammonium nitrate is a contaminant that has been assigned the EPA hazardous waste numbers D001 and D003, and it is a hazardous waste with the characteristics of ignitability and reactivity.

28.     Pursuant to 40 C.F.R. § 261.21(a)(4) and 261.23, as incorporated in Mo. Code Regs. Ann. Tit. 10, § 25-4.261(1), pentaerythritol tetranitrate (PETN) is a contaminant that has been assigned the EPA hazardous waste numbers D001 and D003, and it is a hazardous waste with the characteristics of ignitability and reactivity.

29.     Pink water is wastewater from trinitrotoluene (TNT) operations. Pursuant to 40 C.F.R. § 261.32, as incorporated in Mo. Code Regs. Ann. Tit. 10, § 25-4.261(1), pink water from TNT operations is a listed hazardous waste (waste code K047) because of its characteristic of reactivity.

30.     Pursuant to Mo. Rev. Stat. § 260.360, a "generator" is defined as "any person who produces waste."

31.     Pursuant to RCRA Sections 3005(a)-(d), 42 U.S.C. § 6925(a)-(d), 40 C.F.R. §§ 270.1(b) & (c), facilities that treat, store, or dispose of hazardous waste are required to obtain a permit in order to operate lawfully, unless they are authorized to operate under "interim status" conferred under RCRA Section 3005(e), 42 U.S.C. § 6925(e).

32.     Pursuant to 40 C.F.R. § 262.34(a), as incorporated in Mo. Code Regs. Ann. Tit. 10, § 25-5.262(1), a generator of greater than 1,000 kilograms of hazardous waste in a calendar month is a large quantity generator (LQG) and may accumulate hazardous waste on-site for 90 days or less without a permit or without having interim status provided that the generator complies with the management requirements listed in 40 C.F.R. § 262.34(a) (hereinafter the LQG permit exemption).

33.     Pursuant to 40 C.F.R. § 262.11, as incorporated in Mo. Code Regs. Ann. Tit. 10, § 25-5.262(1), a person that generates a solid waste must determine if that waste is a hazardous waste.

6

34.    Pursuant to 40 C.F.R. § 262.34(a)(3), as incorporated in Mo. Code Regs. Ann. Tit. 10, § 25-5.262(1), a condition of the LQG permit exemption is that a generator must mark each container of hazardous waste clearly with the words "Hazardous Waste."

35.    Pursuant to 40 C.F.R. § 262.34(a)(2), as incorporated in Mo. Code Regs. Ann. Tit. 10, § 25-5.262(1), a condition of the LQG permit exemption is that a generator must mark each container of hazardous waste with an accumulation start date.

36.    Pursuant to 40 C.F.R. § 262.34(a)(4), as incorporated in Mo. Code Regs. Ann. Tit. 10, § 25-5.262(1), a condition of the LQG permit exemption is that a generator must comply with a number of regulations including 40 C.F.R. § 265.51, which requires each owner or operator to have a contingency plan with the elements described in 40 C.F.R. § 265.52.

37.    EPA may enforce the provisions of RCRA and its regulations and the federally-approved Missouri hazardous waste program by filing a civil action in United States District Court seeking civil penalties and injunctive relief.  42 U.S.C. § 6928.

## GENERAL ALLEGATIONS

38.    Dyno owns and operates the Carthage Facility located at 17562 Gum Road, Carthage, Missouri.

39.    At the Carthage Facility, Dyno manufactures commercial explosives, such as dynamite, emulsions explosives, and cast boosters, and related products.

40.    Dyno owns and operates the Louisiana Facility located at 11025 Highway D in Louisiana, Missouri.

41.    At the Louisiana Facility, Dyno manufactures nitric acid, ammonium nitrate, and related raw material for the explosives industry.

7

42. During all times relevant to this Complaint, Dyno discharged wastewaters containing "pollutants," within the meaning of 33 U.S.C. § 1362(6), into Center Creek, tributaries of Center Creek, Buffalo Creek, and the Mississippi River.

43. Each of the tributaries of Center Creek, Buffalo Creek, and the Mississippi River is a "navigable water" and a "water of the United States" under 33 U.S.C. § 1362(7) and 40 C.F.R. § 122.2.

44. The wastewaters from the Carthage Facility and the Louisiana Facility contain "pollutants" as defined by 33 U.S.C. § 1362(6), including, but not limited to, Biochemical Oxygen Demand (BOD), *E. coli*, ammonia, nitrate, nitroglycerin, heat, oil and grease, excessive pH, total suspended solids (TSS), TNT, and PETN.

45. The outfall pipes that discharge from the Carthage Facility into Center Creek and its tributaries are "point sources" within the meaning of the CWA. 33 U.S.C. § 1362(14).

46. The outfall pipes that discharge from the Louisiana Facility into Buffalo Creek and the Mississippi River are "point sources" within the meaning of the CWA. 33 U.S.C. § 1362(14).

47. On September 12, 2008, the State of Missouri issued NPDES Permit MO-0002402 to Dyno (Previous Carthage Permit), and that permit was effective at the Carthage Facility to August 1, 2015.

48. On August 1, 2015, the State of Missouri renewed NPDES Permit MO-0002402 (Current Carthage Permit) with some changes from the 2008 NPDES Permit, including the addition of stormwater requirements, and that permit remains in effect at the Carthage Facility.

49.     On March 2, 2012, the State of Missouri issued NPDES Permit MO-0105783 (Louisiana Permit) to Dyno.  That permit was modified on November 5, 2014, and that permit remains in effect at the Louisiana Facility.

50.     The Previous Carthage Permit, Current Carthage Permit, and Louisiana Permit each contain effluent limitations.  Effluent limitations, as defined in 33 U.S.C. § 1362(11), are restrictions on the quantity, rate, and concentration of chemical, physical, biological, and other constituents of wastewater discharges into navigable waters of the United States.

## FIRST CLAIM FOR RELIEF
(*Discharges of Pollutants in Violation of Effluent Limitations of
NPDES Permit Requirements at Both Facilities*)

51.     The United States realleges paragraphs 1 through 50 above as if fully set forth herein.

52.     The Previous Carthage Permit and the Current Carthage Permit contain effluent limitations for TSS, oil and grease, ammonia, nitrate, and nitroglycerin.

53.     The Louisiana Permit contains effluent limitations for BOD, *E.coli*, ammonia, nitrate, pH, and temperature.

54.     Between June 2011 and August 2017, Dyno discharged wastewater and stormwater into Center Creek, its tributaries, Buffalo Creek, and the Mississippi River on numerous occasions, in violation of its NPDES permits.  As further detailed in Appendix A, Dyno discharged TSS, oil and grease, ammonia, nitrate, pH, and nitroglycerin on at least nineteen occasions in excess of the limits included in the Previous and Current Carthage Permits, and Dyno discharged BOD, *E.coli*, ammonia, nitrate, pH, Oil & Grease and heat on fifty-eight occasions in excess of the limits included in the Louisiana Permit.

9

55. Dyno is therefore in violation of its NPDES permits and 33 U.S.C. §§ 1311 and 1342.

56. Each day of each illegal discharge of pollutants is a separate violation of 33 U.S.C. § 1311.

57. Unless enjoined, Dyno will continue to discharge pollutants in excess of its effluent limits into waters of the United States.

58. Pursuant to 33 U.S.C. §§ 1319(b) and (d), Dyno is liable for injunctive relief and civil penalties. Maximum civil penalties for violations of the CWA are established by 33 U.S.C. § 1319(d) and 40 C.F.R. § 19.4, including violations of any condition or limitation in an NPDES permit. The maximum civil penalty per day per violation of the CWA is $37,500 for violations occurring on or before November 2, 2015, $51,570 per day per CWA violation occurring after November 2, 2015, and $52,414 per day per CWA violation occurring after January 15, 2017.

## SECOND CLAIM FOR RELIEF
*(Unauthorized Discharges of Wastewater at the Carthage Facility)*

59. The United States realleges paragraphs 1 through 50 above as if fully set forth herein.

60. As of August 2014, Dyno was discharging untreated wastewater into Center Creek from a number of pipes protruding from the creek bank and surrounding hillside that were not identified in the Previous Carthage Permit as authorized outfalls. The Current Carthage Permit did not identify these pipes as outfalls either.

61. Dyno does not currently have, and never had, an NDPES permit that authorizes discharges from these unidentified pipes. The discharge from these unidentified pipes is not permitted or otherwise authorized by the Clean Water Act, or other federal, state or local law or regulation.

10

62.     In October 2016, Dyno was discharging PETN from Carthage Facility's outfall 004.

63.     Dyno does not currently have, and never had, an NDPES permit that authorizes PETN discharges from outfall 004. The PETN discharged from outfall 004 is not permitted or otherwise authorized by the Clean Water Act, or other federal, state or local law or regulation.

64.     As of August 2014, Dyno was discharging zinc from Carthage Facility's outfall 010.

65.     Dyno does not currently have, and never had, an NDPES permit that authorizes zinc discharges from outfall 010. The zinc discharged from outfall 010 is not permitted or otherwise authorized by the Clean Water Act, or other federal, state or local law or regulation.

66.     Each day of each illegal discharge is a separate violation of 33 U.S.C. § 1311.

67.     Unless enjoined, Dyno will continue to discharge pollutants into waters of the United States.

68.     Pursuant to 33 U.S.C. §§ 1319(b) and (d), Dyno is liable for injunctive relief and civil penalties.  Maximum civil penalties for violations of the CWA are established by 33 U.S.C. § 1319(d) and 40 C.F.R. § 19.4, including discharges unauthorized by an NPDES permit.  The maximum civil penalty per day per violation of the CWA is $37,500 for violations occurring on or before November 2, 2015, $51,570 per day per CWA violation occurring after November 2, 2015, and $52,414 per day per CWA violation occurring after January 15, 2017.

## THIRD CLAIM FOR RELIEF
*(Violations of the Sampling and Monitoring Requirements of NPDES Permits at Both Facilities)*

69.     The United States realleges paragraphs 1 through 50 above as if fully set forth herein.

70.     The three NPDES permits require Dyno to maintain records at each facility with a minimum amount of information concerning effluent monitoring, including date, time, and location where the sample was collected, and the results of analysis.  See Standard Condition I.A.5, Previous Carthage Permit; Standard Condition I.A.5, Louisiana Permit; and Standard Condition I.A.2, Current Carthage Permit.

71.     The three NPDES permits require Dyno to retain records at each facility for a minimum of five years.  See Standard Condition I.A.7, Previous Carthage Permit; Standard Condition I.A.7, Louisiana Permit; and Standard Condition I.A.5, Current Carthage Permit.

72.     The three NPDES permits require Dyno to sample its water and to use testing procedures that conform to Mo. Code Regs. Ann. Tit. 10, § 20-7.015.  See Standard Condition I.A.4, Previous Carthage Permit; Standard Condition I.A.4, Louisiana Permit; and Standard Condition I.A.4, Current Carthage Permit.

73.     In March 2015 at the Louisiana Facility and in August 2014 at the Carthage Facility, Dyno failed to conduct proper test procedures on its wastewater discharged from both facilities.  Dyno also failed to perform appropriate quality controls on laboratory analyses for various parameters including: temperature, BOD, TSS, ammonia, nitrate, chemical oxygen demand, dissolved oxygen, zinc, hardness, oil and grease, Kjeldahl nitrogen, sulfate, nitroglycerin, and ethylene glycol dinitrate.

74.     For at least the last five years, Dyno's internal laboratory reports from both facilities have been incomplete.  EPA could not verify that Dyno accurately transferred data from

12

the internal lab reports to the discharge monitoring reports because the records were missing dates, outfall numbers, parameters tested, or other necessary information.

75.     As of August 2014, Dyno was not sampling and monitoring the wastewater from outfall 001H at the Carthage Facility, though Dyno was directing wastewater to the outfall.

76.     Unless enjoined, Dyno will continue to discharge pollutants into waters of the United States in violation of the sampling and record-keeping requirements of its NPDES permits.

77.     Pursuant to 33 U.S.C. §§ 1319(b) and (d), Dyno is liable for injunctive relief and civil penalties.  Maximum civil penalties for violations of the CWA are established by 33 U.S.C. § 1319(d) and 40 C.F.R. § 19.4, including violations of any condition or limitation in an NPDES permit.  The maximum civil penalty per day per violation of the CWA is $37,500 for violations occurring on or before November 2, 2015, $51,570 per day per CWA violation occurring after November 2, 2015, and $52,414 per day per CWA violation occurring after January 15, 2017.

### FOURTH CLAIM FOR RELIEF
*(Violations of the Toxicity Conditions of the NPDES Permits at the Carthage Facility)*

78.     The United States realleges paragraphs 1 through 50 above as if fully set forth herein.

79.     The NPDES permits at the Carthage Facility require, "Waters shall be free from substances or conditions in sufficient amounts to result in toxicity to humans, animals or aquatic life."  See Special Condition C.7(b)(4), Previous Carthage Permit; Special Condition E.4(b)(4), Current Carthage Permit.

80.     The acute ammonia toxicity for species that should be found in Center Creek range between 24 and 46 mg/l.  The human health drinking water standard for nitrate is 10 mg/L.

Case 3:19-cv-05031-MDH   Document 1   Filed 04/15/19   Page 13 of 30

81. Between August 2015 and May 2016, Dyno discharged water with, on average, 722 mg/L of ammonia and 1680 mg/L of nitrates via outfall 010 at the Carthage Facility.

82. The acute zinc toxicity for species that should be found in Center Creek range between 51 and 174 ug/L. The human health criteria is 7,400 ug/L.

83. In October 2016, zinc was discharged in water flowing to outfall 010. On August 12, 2014, Dyno discharged water with 441 ug/L of zinc at outfall 010. On October 24, 2016, Dyno discharged an average of 210 ug/L of zinc at Carthage Facility outfall 010.

84. Unless enjoined, Dyno will continue to violate the Special Conditions of its Current Carthage Permit.

85. Pursuant to 33 U.S.C. §§ 1319(b) and (d), Dyno is liable for injunctive relief and civil penalties. Maximum civil penalties for violations of the CWA are established by 33 U.S.C. § 1319(d) and 40 C.F.R. § 19.4, including violations of any condition or limitation in an NPDES permit. The maximum civil penalty per day per violation of the CWA is $37,500 for violations occurring on or before November 2, 2015, and $51,570 per day per violation of the CWA for violations occurring after November 2, 2015.

## FIFTH CLAIM FOR RELIEF
(*Failure to Develop an Adequate Stormwater Pollution Prevention Plan at Carthage Facility*)

86. The United States realleges paragraphs 1 through 50 above as if fully set forth herein.

87. Dyno's NPDES Permits require the Carthage and Louisiana facilities to develop and implement Stormwater Pollution Prevention Plans (SWPPPs). See Special Condition I.C.9, Louisiana Permit; and Special Condition E, Current Carthage Permit.

88. Dyno developed a SWPPP under the Current Carthage Permit, which states: "the SWPPP must include the following: a listing of specific Best Management Practices (BMPs) and

14

a narrative explaining how BMPs will be implemented to control and minimize the amount of potential contaminants that may enter stormwater."

89.     Dyno's Carthage SWPPP fails to identify BMPs necessary to control and minimize dope house emissions from entering stormwater and fails to identify BMPs necessary to control and minimize pollutant discharges from stormwater collected within secondary containment throughout the facility.  (In the dope house, Dyno mixes carbonaceous ingredients such as wood pulp or walnut shells with ammonium nitrate and sodium nitrate as part of the dynamite production process.)

90.     Dyno's SWPPP for Carthage fails to provide a narrative explaining how BMPs identified on pages 9 & 10 of the SWPPP will be implemented to control and minimize the amount of potential contaminants that may enter stormwater.

91.     Dyno's failure to develop an adequate SWPPP is a violation of Dyno's Current Carthage Permit, and as such, is a violation of Sections 301(a) and 402(p) of the CWA, 33 U.S.C. §§ 1311(a) and 1342(p), and implementing regulations.

92.     Pursuant to 33 U.S.C. §§ 1319(b) and (d), Dyno is liable for injunctive relief and civil penalties.  Maximum civil penalties for violations of the CWA are established by 33 U.S.C. § 1319(d) and 40 C.F.R. § 19.4, including violations of any condition or limitation in an NPDES permit.  The maximum civil penalty per day per violation of the CWA is $37,500 for violations occurring on or before November 2, 2015, $51,570 per day per CWA violation occurring after November 2, 2015, and $52,414 per day per CWA violation occurring after January 15, 2017.

## SIXTH CLAIM FOR RELIEF

(*Failure to Adhere to Minimum Best Management Practices (BMPs) Requirements of Louisiana and Current Carthage Permits*)

93.     The United States realleges paragraphs 1 through 50 above as if fully set forth herein.

94.     Dyno's NPDES Permits require the Carthage and Louisiana facilities to comply with minimum BMPs including the requirements to: (1) prevent the spillage or loss of fluids, oil, grease, fuel, etc. from vehicle maintenance, equipment cleaning, or warehouse activities and thereby prevent the contamination of storm water from these substances; (2) provide collection facilities and arrange for proper disposal of waste products; and (3) provide sediment and erosion control sufficient to prevent or control sediment loss off of the property.  See Special Condition C. 10, Louisiana Permit; and Special Condition E, Current Carthage Permit.

95.     Dyno was spilling contact cooling water from the chub production area at the time of EPA's inspection of the Carthage Facility in August 2014.  This spillage is ongoing, as witnessed by a state inspector on January 29, 2016, and federal inspectors in October 2016 and July 2017.

96.     The spilled contact cooling water contains ammonia and nitrates.  EPA's soil samples collected at one location where contact cooling water is spilled contained 1,050 mg/kg of ammonia and 357 mg/kg of nitrate.  Dyno's samples of the contact cooling water contained excessive amounts of ammonia and nitrates.

97.     By allowing the contact cooling water to spill without containment, Dyno failed to provide collection and arrange for disposal of waste products.

98.     At the time of EPA's Inspection and the October 2016 site visit of the Carthage facility, EPA observed particulate emissions from the dope house accumulated on the ground

16

exposed to precipitation. In October 2016, sampling results of the particulate emissions collected outside of the dope house contained 17,200 mg/kg of nitrate.

99.     By allowing the dope house particulate emissions to accumulate on the ground around the exterior of the dope house, Dyno failed to provide collection and arrange for disposal of waste products as required by the Current Carthage Permit.

100.     Section 6.1 of the Louisiana SWPPP requires Dyno's employees to promptly clean up spilled or released material and that they must be vigilant about dry cleanup (*i.e.* routine sweeping and cleanup where fugitive dusts and other materials may accumulate) in the prill truck and rail loading areas.

101.     Section 7 of the Louisiana SWPPP explains that if an inspection report describes deficiencies in pollution control structures or procedures, Dyno will immediately correct such deficiencies and immediately update the SWPPP to reflect the required changes.

102.     Section 9 of the Louisiana SWPPP specifies that in the event of a spill that impacts stormwater or the stormwater collection and retention system, Dyno will: "(1) investigate the spill; (2) assess the spill/release information gathered by the investigation; (3) take necessary steps to prevent injury to personnel, damage to equipment, and potential fire hazard; and (4) initiate action to contact additional management or emergency personnel to stop the spillage, initiate defensive action to contain the spill, and prevent runoff into a ditch, sewer, or storm drain."

103.     The Louisiana Permit requires that Dyno document all corrective actions taken to remedy deficiencies within 14 days of discovery.

104.     In March 2015, EPA's inspector identified multiple areas where Dyno's failure to clean up and dispose of waste products, or provide sediment and erosion control sufficient to

17

prevent or control sediment loss off of the property or take corrective action resulted in the exposure of pollutants to precipitation events at the Louisiana Facility.

105. On various dates from November 25, 2013, through February 26, 2015,[1] Dyno completed inspections of the Louisiana Facility pursuant to its SWPPP and reported numerous areas where Dyno failed to clean up and dispose of spills or releases, or provide sediment and erosion control sufficient to prevent or control sediment loss off of the property, resulting in the exposure of pollutants to precipitation. The same inspection reports also noted several instances where containment structures needed repairs, but Dyno never documented any corrective actions.

106. Dyno's failure to adhere to minimum BMPs is in violation of Dyno's Current Carthage Permit and Louisiana Permit, and as such, is in violation of Sections 301(a) and 402(p) of the CWA, 33 U.S.C. §§ 1311(a) and 1342(p), and implementing regulations.

107. Pursuant to 33 U.S.C. §§ 1319(b) and (d), Dyno is liable for injunctive relief and civil penalties. Maximum civil penalties for violations of the CWA are established by 33 U.S.C. § 1319(d) and 40 C.F.R. § 19.4, including violations of any condition or limitation in an NPDES permit. The maximum civil penalty per day per violation of the CWA is $37,500 for violations occurring on or before November 2, 2015, $51,570 per day per CWA violation occurring after November 2, 2015, and $52,414 per day per CWA violation occurring after January 15, 2017.

---

[1] Dyno dated the inspection reports November 25, 2013; December 4, 2013; January 24, 2014; February 11, 2014; April 21, 2014; May 30, 2014; June 17, 2014; July 30, 2014; August 20, 2014; September 16, 2014; October 22, 2014; November 19, 2014; December 15, 2014; January 30, 2015; and February 26, 2015.

18

## SEVENTH CLAIM FOR RELIEF
### *(Operating a Hazardous Waste Facility Without a Permit or Interim Status)*

108.    The United States realleges paragraphs 1 through 50 above as if fully set forth

herein.

109.    Pursuant to Mo. Rev. Stat. § 260.390 [42 U.S.C. § 6925], all treatment, storage,

and disposal facilities must not operate without first obtaining a permit.

110.    Pursuant to Mo. Rev. Stat. § 260.360.1(7) [42 U.S.C. § 6903], "disposal" means

"discharge, deposit, injection, dumping, spilling, leaking, or placing of any waste into or on any

land or water so that such waste, or any constituent thereof, may enter the environment or be

emitted into the air or be discharged into the waters, including groundwaters."

111.    In August 2014, an EPA inspector observed waste-like materials that Dyno had

generated at the Carthage Facility, including: a container of suspected wash water located in the

hazardous waste storage area; and cooling water leaking from the troughs used to transport chub

explosives on to the ground, seeping under the building walls and into the soil.  The material

seeping under the building and into the soil had the appearance of black sludge.

112.    In October 2016, a soil sample taken under a dripping pipe that Dyno claims

conveyed air compressor/AC unit condensate at the Carthage Facility contained 26,000 ug/kg

PETN and 5,900 ug/kg TNT.

113.    On March 22, 2017, Dyno Nobel collected two samples of the laundry water at

the Carthage Facility, which is discharged through outfall 003, and found 10,000 ug/L of TNT in

each sample, and 120 ug/L and 150 ug/L of PETN.

114.    The discharge of explosives was not permitted at outfall 003 at the Carthage

Facility.  The laundry wastewater does not receive the necessary treatment to remove explosives

and may potentially contaminate surface water, ground water and the soil along the flow path.

19

115.     In March 2015, an EPA inspector observed waste-like materials that Dyno had generated at the Louisiana Facility, including prilled (or solid spherical) ammonium nitrate spilled on the ground throughout the buildings and outside of buildings.

116.     On nine occasions from April 21, 2014 through February 26, 2015, in its inspection reports conducted under its SWPPP, Dyno documented the presence of prilled ammonium nitrate scattered on the ground of the Louisiana Facility, exposed to precipitation events.

117.     The wastes identified in Paragraphs 111 through 116, above, were discarded materials that had been abandoned by Dyno or are inherently waste-like.  Therefore, these wastes were solid wastes within the meaning of 40 C.F.R. § 261.2, as incorporated in Mo. Code Regs. Ann. Tit. 10, § 25-4.261(1).

118.     Dyno did not have a permit to dispose of any of these solid wastes at either of its facilities.

119.     Dyno violated Mo. Rev. Stat. § 260.390 [42 U.S.C. § 6925] by disposing of hazardous waste at its Carthage and Louisiana facilities without a permit.

120.     Pursuant to 40 C.F.R. § 262.11, as incorporated by reference at 10 C.S.R. 25-5.262(1), a generator of solid waste, as defined in 40 C.F.R. § 260.10, is required to determine if the solid waste is a hazardous waste.

121.     Dyno had not made a hazardous waste determination on any of these solid wastes generated at either of its facilities.

122.     Dyno's failure to make a hazardous waste determination is a violation of Mo. Code Regs. Ann. Tit. 10, §  25-5.262(1), 40 C.F.R. § 262.11.

123. Each day that hazardous waste was disposed at the Carthage and Louisiana facilities without a permit or a hazardous waste determination constitutes a separate violation pursuant to Section 3008(g) of RCRA, 42 U.S.C. § 6928(g).

124. Pursuant to 42 U.S.C. § 6928(g) and 40 C.F.R. § 19.4, Dyno is liable to the United States for a civil penalty in an amount not to exceed $37,500 per day for each violation occurring after January 12, 2009, and $71,264 per day for each violation occurring after January 2, 2015.

### EIGHTH CLAIM FOR RELIEF
*(Failing to Meet the RCRA Generator Requirements at the Carthage and Louisiana Facilities)*

125. The United States realleges paragraphs 1 through 50 above as if fully set forth herein.

126. The regulations at 40 C.F.R. § 262.34(b), as incorporated by reference at Mo. Code Regs. Ann. Tit. 10, § 25-5.262, state that a generator who accumulates hazardous waste for more than 90 days is an operator of a storage facility and is subject to the requirements of 40 C.F.R. Parts 264 and 265 and the permit requirements of 40 C.F.R. Part 270 unless it has been granted an extension to the 90 days.

127. From September 23 to 25, 2014, Dyno had been accumulating hazardous waste at its Carthage Facility in excess of 90 days. Specifically Dyno was keeping one 55-gallon drum of corrosive hazardous waste material unlabeled and outdoors since at least December 2013.

128. By accumulating hazardous waste in excess of the time period allowed by the LQG permit exemption and failing to comply with the management requirements listed in the LQG permit exemption, Dyno was storing hazardous waste without a permit or interim status, in violation of 42 U.S.C. § 6925(a).

129. The wastes identified in Paragraphs 111 through 116, above, were discarded materials that had been abandoned by Dyno or are inherently waste-like. Therefore, these wastes were solid wastes within the meaning of 40 C.F.R. § 261.2, as incorporated in Mo. Code Regs. Ann. Tit. 10, § 25-4.261(1).

130. The regulations at 40 C.F.R. § 262.34(a)(2) require that while being accumulated on-site, each hazardous waste container has the date upon which each period of accumulation begins clearly marked and visible for inspection on each container. The regulations at 40 C.F.R. § 262.34(a)(3) require that while being accumulated on-site, each hazardous waste container is labeled or marked clearly with the words, "Hazardous Waste".

131. In September 2014, Dyno was storing hazardous waste at its Carthage Facility in numerous containers of which it had failed to label with an accumulation start date and/or with the words "Hazardous Waste."

132. By failing to adhere to the labeling conditions of the LQG permit exemption, Dyno was storing hazardous waste without a permit or interim status, in violation of 42 U.S.C. § 6925(a).

133. The regulations at 40 C.F.R. § 265.51, as found in Part 265 Subpart D, require that each owner or operator must have a contingency plan for his facility. The contingency plan must contain the elements described in 40 C.F.R. § 265.52.

134. As of September 2014, Dyno had not updated its Carthage Facility contingency plan with the names of the emergency coordinators since December 3, 2013. The contingency plan should have been updated at least as early as February 2014.

135. Each day that Dyno accumulated hazardous waste beyond the time period allowed by the LQG permit exemption; failed to properly label hazardous waste; and failed to update its

22

Carthage Facility contingency plan  constitutes a separate violation pursuant to Section 3008(g) of RCRA, 42 U.S.C. § 6928(g).

136.     Pursuant to 42 U.S.C. § 6928(g) and 40 C.F.R. § 19.4, Dyno is liable to the United States for a civil penalty in an amount not to exceed $37,500 per day for each violation occurring after January 12, 2009, and $71,264 per day for each violation occurring after January 2, 2015.

## NINTH CLAIM FOR RELIEF
*(Offering Waste Without a Manifest & Transporting Waste to a Facility Without a Permit at the Carthage Facility)*

137.     The United States realleges paragraphs 1 through 50 above as if fully set forth herein.

138.     Pursuant to Mo. Rev. Stat. § 260.380.1(6), hazardous waste generators must provide a separate manifest to the transporter for each load of hazardous waste transported from the premises where it was generated.

139.     Pursuant to Mo. Rev. Stat. § 260.380.1(7), hazardous waste generators must only use a hazardous waste facility authorized to operate pursuant to the Missouri Hazardous Waste Management Law, RCRA, or another state's hazardous waste management program authorized pursuant to RCRA for treatment, resource recovery, disposal or storage of hazardous waste.

140.     During its RCRA inspection, EPA found that Dyno failed to manifest wastewater shipped off-site from the Thermal Treatment Unit of the Carthage Facility, though that wastewater contained lead in concentrations over 5 mg/liter and is thus a hazardous waste.

141.     Upon information and belief, Dyno continues to ship offsite wastewater from the Thermal Treatment Unit of the Carthage Facility, though that wastewater contains lead in concentrations at or over 5 mg/liter and is thus a hazardous waste.

23

142.     Each day that Dyno failed to manifest its shipments of hazardous wastewater constitutes a separate violation pursuant to Section 3008(g) of RCRA, 42 U.S.C. § 6928(g).

143.     Pursuant to 42 U.S.C. § 6928(g) and 40 C.F.R. § 19.4, Dyno is liable to the United States for injunctive relief and a civil penalty in an amount not to exceed $37,500 per day for each violation occurring after January 12, 2009, and $71,264 per day for each violation occurring after January 2, 2015.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff the United States respectfully requests that this Court grant the following relief:

1.     Enter judgment finding Dyno is liable for the foregoing violations;

2.     Assess civil penalties against Dyno  in amounts not to exceed those provided pursuant to 33 U.S.C. § 1319(d) and 42 U.S.C. § 6928(g);

3.     Order Dyno to take appropriate steps as may be necessary to remedy violations pursuant to 33 U.S.C. § 1319(b) and 42 U.S.C. § 6928(a);

4.     Award the United States its costs in this action; and

5.     Grant such other and further relief as the Court deems just and proper.

 Respectfully submitted,


JEFFREY BOSSERT CLARK
Assistant Attorney General
Environment & Natural Resources Division
United States Department of Justice

*s/ Katherine L. Matthews*
KATHERINE L. MATTHEWS
Senior Counsel
Environmental Enforcement Section
Environment & Natural Resources Division
United States Department of Justice
999 18th Street

24

South Terrace – Suite 370
Denver, CO 80202
Phone: 303-844-1365
Fax: 303-844-1350
Kate.Matthews@usdoj.gov

*s/ Danica Anderson Glaser*
DANICA ANDERSON GLASER, DC #1005853
Trial Attorney
Environmental Enforcement Section
Environment & Natural Resources Division
U.S. Department of Justice
P.O. Box 7611, Ben Franklin Station
Washington, DC 20044
Phone: 202-514-5270
danica.glaser@usdoj.gov


Timothy A. Garrison
United States Attorney
Western District of Missouri

*s/ Charles M. Thomas*
CHARLES M. THOMAS, MO Bar #28522
Assistant United States Attorney
Charles Evans Whittaker Courthouse
400 East Ninth Street, Room 5510
Kansas City, MO 64106
Phone: 816-426-3130
charles.thomas@usdoj.gov

25

## Appendix A

**Louisiana Facility Effluent Limit Violations**

| Louisiana Outfall | DMR Date | Parameter | Unit | Limit | Limit type | DMR |
|---|---|---|---|---|---|---|
| 001 | 6/30/2011 | Ammonia | lb/day | 147 | Monthly Avg. | 181 |
| 001 | 7/31/2011 | Temperature | deg F | 100 | Daily Max. | 107 |
| 001 | 7/31/2011 | Temperature | deg F | 100 | Daily Max. | 104 |
| 001 | 7/31/2011 | Temperature | deg F | 100 | Daily Max. | 103 |
| 001 | 7/31/2011 | Temperature | deg F | 100 | Daily Max. | 101 |
| 001 | 7/31/2011 | Temperature | deg F | 100 | Daily Max. | 105 |
| 001 | 7/31/2011 | Temperature | deg F | 100 | Daily Max. | 102 |
| 001 | 8/31/2011 | Temperature | deg F | 100 | Daily Max. | 102 |
| 001 | 8/31/2011 | Temperature | deg F | 100 | Daily Max. | 103 |
| 001 | 8/31/2011 | Temperature | deg F | 100 | Daily Max. | 102 |
| 001 | 8/31/2011 | Temperature | deg F | 100 | Daily Max. | 104 |
| 001 | 12/31/2011 | Ammonia | lb/day | 147 | Monthly Avg. | 157 |
| 001 | 2/29/2012 | Temperature | deg F | 100 | Daily Max. | 102 |
| 001 | 3/19/2012 | Temperature, Tcap | deg F | 57 | Daily Max. | 60.0 |
| 001 | 3/20/2012 | Temperature, Tcap | deg F | 57 | Daily Max. | 61.0 |
| 001 | 3/20/2012 | Temperature, Tmax | deg F | 60 | Daily Max. | 61.0 |
| 001 | 3/21/2012 | Temperature, Tcap | deg F | 57 | Daily Max. | 63.0 |
| 001 | 3/21/2012 | Temperature, Tmax | deg F | 60 | Daily Max. | 63.0 |
| 001 | 3/22/2012 | Temperature, Tcap | deg F | 57 | Daily Max. | 63.0 |
| 001 | 3/22/2012 | Temperature, Tmax | deg F | 60 | Daily Max. | 63.0 |
| 001 | 3/23/2012 | Temperature, Tcap | deg F | 57 | Daily Max. | 63.0 |
| 001 | 3/23/2012 | Temperature, Tmax | deg F | 60 | Daily Max. | 63.0 |
| 001 | 3/24/2012 | Temperature, Tcap | deg F | 57 | Daily Max. | 63.0 |
| 001 | 3/24/2012 | Temperature, Tmax | deg F | 60 | Daily Max. | 63.0 |
| 001 | 3/25/2012 | Temperature, Tcap | deg F | 57 | Daily Max. | 64.0 |
| 001 | 3/25/2012 | Temperature, Tmax | deg F | 60 | Daily Max. | 64.0 |
| 001 | 3/26/2012 | Temperature, Tcap | deg F | 57 | Daily Max. | 63.0 |
| 001 | 3/26/2012 | Temperature, Tmax | deg F | 60 | Daily Max. | 63.0 |
| 001 | 3/27/2012 | Temperature, Tcap | deg F | 57 | Daily Max. | 64.0 |
| 001 | 3/27/2012 | Temperature, Tmax | deg F | 60 | Daily Max. | 64.0 |
| 001 | 3/28/2012 | Temperature, Tcap | deg F | 57 | Daily Max. | 64.0 |
| 001 | 3/28/2012 | Temperature, Tmax | deg F | 60 | Daily Max. | 64.0 |
| 001 | 3/29/2012 | Temperature, Tcap | deg F | 57 | Daily Max. | 62.0 |
| 001 | 3/29/2012 | Temperature, Tmax | deg F | 60 | Daily Max. | 62.0 |
| 001 | 3/30/2012 | Temperature, Tcap | deg F | 57 | Daily Max. | 62.0 |
| 001 | 3/30/2012 | Temperature, Tmax | deg F | 60 | Daily Max. | 62.0 |

| Louisiana Outfall | DMR Date | Parameter | Unit | Limit | Limit type | DMR |
|---|---|---|---|---|---|---|
| 001 | 3/31/2012 | Temperature, Tcap | deg F | 57 | Daily Max. | 62.0 |
| 001 | 3/31/2012 | Temperature, Tcap | deg F | 57 | Monthly Avg. | 60.8 |
| 001 | 3/31/2012 | Temperature, Tmax | deg F | 60 | Daily Max. | 62.0 |
| 001 | 3/31/2012 | Temperature, Tmax | deg F | 60 | Monthly Avg. | 60.8 |
| 001 | 5/31/2012 | Ammonia | lb/day | 148 | Monthly Avg. | 174 |
| 001 | 6/30/2012 | pH | SU | 6.5 | Minimum | 6.3 |
| 001 | 6/30/2012 | pH | SU | 6.5 | Minimum | 5.8 |
| 001 | 10/31/2012 | pH | SU | 9 | Maximum | 10.2 |
| 001 | 12/31/2012 | Ammonia | lb/day | 148 | Monthly Avg. | 166 |
| 001 | 1/31/2013 | pH | SU | 9 | Maximum | 9.2 |
| 001 | 4/30/2013 | Ammonia | lb/day | 148 | Monthly Avg. | 157 |
| 001 | 7/31/2013 | pH | SU | 9 | Maximum | 9.5 |
| 001 | 9/30/2013 | pH | SU | 6.5 | Minimum | 6.4[2] |
| 001 | 9/30/2013 | Nitrate | lb/day | 893 | Daily Max. | 1123 |
| 001 | 9/30/2013 | Nitrate | lb/day | 341 | Monthly Avg. | 349 |
| 001 | 10/31/2013 | pH | SU | 6.5 | Minimum | 6.4[1] |
| 002 | 11/21/2013 | BOD | mg/L | 45 | Weekly Avg. | 46 |
| 002 | 11/27/2013 | BOD | mg/L | 45 | Weekly Avg. | 54 |
| 002 | 11/30/2013 | BOD, 5-day | mg/L | 30 | Monthly Avg. | 65.7 |
| 002 | 11/30/2013 | BOD, 5-day | mg/L | 45 | Weekly Avg. | 100 |
| 001 | 12/31/2013 | pH | SU | 6.5 | Minimum | 6.3 |
| 002 | 6/30/2014 | E. coli | CFU/100mL | 630 | Daily Max. | 14100 |
| 002 | 6/30/2014 | E. coli | CFU/100mL | 126 | Monthly Avg. | 246.3 |
| 002 | 6/30/2014 | E. coli | CFU/100mL | 630 | Daily Max. | 2610 |
| 001 | 8/31/2014 | pH | SU | 6.5 | Minimum | 6.1 |
| 002 | 9/30/2014 | E. coli | CFU/100mL | 630 | Daily Max. | 5750 |

[2] Dyno Nobel did not report hours out of compliance in accordance with the permit. As such, 24 hours of noncompliance was concluded from the presented data.

| Louisiana Outfall | DMR Date | Parameter | Unit | Limit | Limit type | DMR |
|---|---|---|---|---|---|---|
| 001 | 10/31/2014 | Nitrate | lb/day | 341 | Monthly Avg. | 343 |
| 001 | 11/30/2014 | Ammonia | lb/day | 122 | Monthly Avg. | 157 |
| 001 | 12/31/2014 | Ammonia | lb/day | 122 | Monthly Avg. | 158 |
| 001 | 1/31/2015 | Ammonia | lb/day | 122 | Monthly Avg. | 217 |
| 001 | 2/28/2015 | Nitrate | lb/day | 341 | Monthly Avg. | 358 |
| 001 | 2/28/2015 | Ammonia | lb/day | 122 | Monthly Avg. | 182 |
| 001 | 3/31/2015 | Ammonia | lb/day | 122 | Monthly Avg. | 208 |
| 002 | 6/30/2015 | E. coli | CFU/100mL | 630 | Daily Max. | 8660 |
| 001 | 6/30/2015 | Nitrate | lb/day | 893 | Daily Max. | 957 |
| 001 | 6/30/2015 | Nitrate | lb/day | 341 | Monthly Avg. | 371 |
| 003 | 7/31/2015 | pH | SU | 9 | Maximum | 9.2 |
| 003 | 7/31/2015 | pH | SU | 9 | Maximum | 9.5 |
| 003 | 7/31/2015 | pH | SU | 9 | Maximum | 9.2 |
| 003 | 7/31/2015 | pH | SU | 9 | Maximum | 9.3 |
| 002 | 7/31/2015 | E. coli | CFU/100mL | 630 | Daily Max. | 839 |
| 001 | 11/30/2015 | Ammonia | lb/day | 122 | Monthly Avg. | 123[3] |
| 001 | 12/31/2015 | Ammonia | lb/day | 122 | Monthly Avg. | 146 |
| 001 | 2/28/2016 | ammonia | lb/day | 122 | Monthly Avg. | 126.8[2] |
| 001 | 3/21/2016 | pH | SU | 9 | Maximum | 9.1[4] |
| 001 | 3/21/2016 | pH | SU | 9 | Maximum | 9.8[3] |
| 001 | 3/31/2016 | Ammonia | lb/day | 122 | Monthly Avg. | 170 |
| 003 | 6/30/2016 | pH | SU | 9 | Maximum | 9.3 |
| 003 | 7/12/2016 | pH | SU | 9 | Maximum | 9.3 |
| 003 | 7/12/2016 | pH | SU | 9 | Maximum | 9.3 |
| 003 | 7/12/2016 | pH | SU | 9 | Maximum | 9.1 |
| 003 | 7/12/2016 | pH | SU | 9 | Maximum | 9.5 |
| 003 | 7/19/2016 | pH | SU | 9 | Maximum | 9.5 |
| 003 | 7/19/2016 | pH | SU | 9 | Maximum | 9.4 |
| 003 | 7/19/2016 | pH | SU | 9 | Maximum | 9.5 |

[3] DMR data incorrectly calculated. Recalculated the average using the supporting data provided with the DMR.

[4] Dyno Nobel did not report hours out of compliance in accordance with the permit for 3/21/16 nor 2/23/16. As such, 24 hours of noncompliance was concluded from the presented data

| Louisiana Outfall | DMR Date | Parameter | Unit | Limit | Limit type | DMR |
|---|---|---|---|---|---|---|
| 003 | 7/19/2016 | pH | SU | 9 | Maximum | 9.5 |
| 003 | 10/31/2016 | E. coli | CFU/100mL | 630 | Daily Max. | 4880 |
| 002 | 10/31/2016 | E. coli | CFU/100mL | 630 | Daily Max. | 242000 |
| 002 | 10/31/2016 | E. coli | CFU/100mL | 126 | Monthly Avg. | 1711 |
| 001 | 10/31/2016 | Oil and | mg/L | 15 | Daily Max. | 86 |
| 001 | 10/31/2016 | Oil and grease | mg/L | 10 | Monthly Avg. | 10.4[5] |
| 002 | 4/30/2017 | E. coli | CFU/100mL | 630 | Daily Max. | 4110 |

---

[5] DMR reporting violation in addition to effluent violation for Oil and Grease. The reporting limit identified in Dyno Noble's sample analysis SOP is 2.0 mg/L. The DMR for this month included values of less than 2 mg/L for 9 samples. The monthly average was recalculated correctly.

**Carthage Facility Effluent Limit Violations**

| Carthage Outfall | DMR Date | Parameter | Units | Limit | Limit Type | DMR |
|---|---|---|---|---|---|---|
| 004 | 10/31/2012 | Ammonia | mg/L | 14 | Monthly Avg. | 41.3 |
| 004 | 10/31/2012 | Ammonia | mg/L | 36 | Daily Max. | 89.9 |
| 004 | 10/31/2012 | Nitrate | mg/L | 136 | Daily Max. | 138 |
| 004 | 10/31/2012 | Nitrate | mg/L | 68 | Monthly Avg. | 71.2 |
| 003 | 10/31/2012 | pH | SU | 6.5 | Minimum | 1.2 |
| 003 | 11/30/2012 | pH | SU | 9 | Maximum | 9.6 |
| 003 | 11/30/2012 | pH | SU | 9 | Maximum | 9.6 |
| 004 | 1/31/2013 | Ammonia | mg/L | 14 | Monthly Avg. | 20.3 |
| 004 | 1/31/2014 | Nitroglycerin | mg/L | 0.21 | Daily Max. | 2.5 |
| 004 | 1/31/2014 | Nitroglycerin | mg/L | 0.11 | Monthly Avg. | 2.5 |
| 004 | 3/31/2014 | Nitroglycerin | mg/L | 0.21 | Daily Max. | 2.5 |
| 004 | 3/31/2014 | Nitroglycerin | mg/L | 0.11 | Monthly Avg. | 2.5 |
| 003 | 4/30/2014 | pH | SU | 9 | Maximum | 9.5 |
| 003 | 5/30/2014 | pH | SU | 9 | Maximum | 9.1 |
| 003 | 1/31/2015 | pH | SU | 9 | Maximum | 10.2 |
| 008 | 3/31/2015 | TSS | mg/L | 30 | Monthly Avg. | 38 |
| 004 | 5/31/2015 | TSS | mg/L | 30 | Monthly Avg. | 48.7 |
| 004 | 5/31/2015 | TSS | mg/L | 50 | Maximum | 140 |
| 009 | 6/30/2015 | TSS | mg/L | 30 | Monthly Avg. | 32 |
| 013 | 9/30/2015 | pH | SU | 6.5 | Minimum | 4.9 |
| 016 | 9/30/2015 | pH | SU | 6.5 | Minimum | 5.2 |
| 003 | 8/31/2017 | pH | SU | 9 | Maximum | 9.4 |

5

JS 44 (Rev. 02/19)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

UNITED STATES OF AMERICA

**(b)** County of Residence of First Listed Plaintiff _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Katherine Matthews, U.S. Department of Justice, 999 18th St., South Terr., Ste. 370, Denver, CO 80202, 303-844-1365; Charles Thomas, 400 E. Ninth St., Rm 5510, Kansas City, MO, 64106, 816-426-3130

## DEFENDANTS

DYNO NOBEL, INC.

County of Residence of First Listed Defendant    Jasper
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☒ 1  U.S. Government Plaintiff
- ☐ 2  U.S. Government Defendant
- ☐ 3  Federal Question *(U.S. Government Not a Party)*
- ☐ 4  Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)* *and One Box for Defendant)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 151 Medicare Act<br>☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans)<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholders' Suits<br>☐ 190 Other Contract<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | **PERSONAL INJURY**<br>☐ 310 Airplane<br>☐ 315 Airplane Product Liability<br>☐ 320 Assault, Libel & Slander<br>☐ 330 Federal Employers' Liability<br>☐ 340 Marine<br>☐ 345 Marine Product Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle Product Liability<br>☐ 360 Other Personal Injury<br>☐ 362 Personal Injury - Medical Malpractice | **PERSONAL INJURY**<br>☐ 365 Personal Injury - Product Liability<br>☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability<br>☐ 368 Asbestos Personal Injury Product Liability<br>**PERSONAL PROPERTY**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal Property Damage<br>☐ 385 Property Damage Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881<br>☐ 690 Other | ☐ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal 28 USC 157<br>**PROPERTY RIGHTS**<br>☐ 820 Copyrights<br>☐ 830 Patent<br>☐ 835 Patent - Abbreviated New Drug Application<br>☐ 840 Trademark<br>**SOCIAL SECURITY**<br>☐ 861 HIA (1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g))<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g)) | ☐ 375 False Claims Act<br>☐ 376 Qui Tam (31 USC 3729(a))<br>☐ 400 State Reapportionment<br>☐ 410 Antitrust<br>☐ 430 Banks and Banking<br>☐ 450 Commerce<br>☐ 460 Deportation<br>☐ 470 Racketeer Influenced and Corrupt Organizations<br>☐ 480 Consumer Credit<br>☐ 485 Telephone Consumer Protection Act<br>☐ 490 Cable/Sat TV<br>☐ 850 Securities/Commodities/ Exchange<br>☐ 890 Other Statutory Actions<br>☐ 891 Agricultural Acts<br>☒ 893 Environmental Matters<br>☐ 895 Freedom of Information Act<br>☐ 896 Arbitration<br>☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision<br>☐ 950 Constitutionality of State Statutes |
| **REAL PROPERTY**<br>☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property | **CIVIL RIGHTS**<br>☐ 440 Other Civil Rights<br>☐ 441 Voting<br>☐ 442 Employment<br>☐ 443 Housing/ Accommodations<br>☐ 445 Amer. w/Disabilities - Employment<br>☐ 446 Amer. w/Disabilities - Other<br>☐ 448 Education | **PRISONER PETITIONS**<br>**Habeas Corpus:**<br>☐ 463 Alien Detainee<br>☐ 510 Motions to Vacate Sentence<br>☐ 530 General<br>☐ 535 Death Penalty<br>**Other:**<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition<br>☐ 560 Civil Detainee - Conditions of Confinement | **LABOR**<br>☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Management Relations<br>☐ 740 Railway Labor Act<br>☐ 751 Family and Medical Leave Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Employee Retirement Income Security Act<br>**IMMIGRATION**<br>☐ 462 Naturalization Application<br>☐ 465 Other Immigration Actions | **FEDERAL TAX SUITS**<br>☐ 870 Taxes (U.S. Plaintiff or Defendant)<br>☐ 871 IRS—Third Party 26 USC 7609 | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation - Transfer
- ☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
33 U.S.C. §§ 1311(a) and 1342; 42 U.S.C. §§ 6922 and 6925

Brief description of cause:
Enforcement action pursuant to Clean Water Act and Resource Conservation and Recovery Act

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $ _____

CHECK YES only if demanded in complaint:
JURY DEMAND:    ☐ Yes    ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions)*
JUDGE _____    DOCKET NUMBER _____

DATE  4/15/19

SIGNATURE OF ATTORNEY OF RECORD  *[signature]*

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____