UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI IN THE
SOUTHWESTERN DIVISION


UNITED STATES OF AMERICA,           )
                                    )
              Plaintiff,            )
                                    )
        vs.                         )        Civil No.  19-5031-MDH
                                    )
                                    )
DYNO NOBEL, INC.,                   )        **CONSENT DECREE**
                                    )
              Defendant.            )
                                    )
_____     )


TABLE OF CONTENTS

I.      JURISDICTION AND VENUE ........................................................................................1
II.     APPLICABILITY ......................................................................................................1
III.    DEFINITIONS ...........................................................................................................2
IV.     CIVIL PENALTY .......................................................................................................3
V.      COMPLIANCE REQUIREMENTS ................................................................................4
VI.     REPORTING REQUIREMENTS .................................................................................11
VII.    STIPULATED PENALTIES ......................................................................................12
VIII.   FORCE MAJEURE ...................................................................................................15
IX.     DISPUTE RESOLUTION ..........................................................................................16
X.      INFORMATION COLLECTION AND RETENTION .....................................................17
XI.     EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS ..........................................18
XII.    COSTS ....................................................................................................................19
XIII.   NOTICES ................................................................................................................20
XIV.    EFFECTIVE DATE ...................................................................................................21
XV.     RETENTION OF JURISDICTION ..............................................................................21
XVI.    MODIFICATION ......................................................................................................21
XVII.   TERMINATION .......................................................................................................21
XVIII.  PUBLIC PARTICIPATION .......................................................................................22
XIX.    SIGNATORIES/SERVICE .........................................................................................22
XX.     INTEGRATION ........................................................................................................22
XXI.    FINAL JUDGMENT .................................................................................................23
XXII.   26 U.S.C. SECTION 162(F)(2)(A)(II) IDENTIFICATION ..........................................23
XXIII.  APPENDICES ..........................................................................................................23

i

Plaintiff United States of America, on behalf of the United States Environmental Protection Agency ("EPA"), has filed a complaint in this action, alleging that Defendant, Dyno Nobel, Inc. (as defined below) violated the Clean Water Act ("CWA"), 33 U.S.C. §§ 1311(a) and 1342, and the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. §§ 6922 and 6925.

The Complaint against Defendant alleges that, at its facilities in Carthage and Louisiana, Missouri, Defendant violated the CWA and RCRA in the following ways: failing to comply with its National Pollutant Discharge Elimination System ("NPDES") permits; discharging pollutants without a NPDES permit; operating a hazardous waste facility without a RCRA permit; failing to meet the various RCRA generator requirements; and offering hazardous waste without a RCRA manifest.

Defendant does not admit any liability to the United States arising out of the transactions or occurrences alleged in the Complaint.

The Parties (as defined below) recognize, and the Court by entering this Consent Decree finds, that this Consent Decree has been negotiated by the Parties in good faith and will avoid litigation between the Parties and that this Consent Decree is fair, reasonable, and in the public interest.

NOW, THEREFORE, before the taking of any testimony, without the adjudication or admission of any issue of fact or law except as provided in Section I, and with the consent of the Parties, IT IS HEREBY ADJUDGED, ORDERED, AND DECREED as follows:

## I.     JURISDICTION AND VENUE

1.     This Court has jurisdiction over the subject matter of this action, pursuant to 28 U.S.C. §§ 1331, 1345, and 1355, 33 U.S.C. § 1319(b), and 42 U.S.C. § 6928, and over the Parties. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1395, 33 U.S.C. § 1319(b), and 42 U.S.C. § 6928 because events giving rise to this action arose within this judicial district, and because Defendant owns and operates a facility within this district. For purposes of this Decree, or any action to enforce this Decree, Defendant consents to the Court's jurisdiction over this Decree and any such action and over Defendant and consents to venue in this judicial district.

2.     For purposes of this Consent Decree, Defendant agrees that the Complaint states claims upon which relief may be granted pursuant to 33 U.S.C. §§ 1311(a) and 1342 and 42 U.S.C. §§ 6922 and 6925.

## II.     APPLICABILITY

3.     The obligations of this Consent Decree apply to and are binding upon the United States, and upon Defendant and any successors, assigns, or other entities or persons otherwise bound by law.

4.     No transfer of ownership or operation of either of the Facilities (as defined below), whether in compliance with the procedures of this Paragraph or otherwise, shall relieve Defendant of its obligation to ensure that the terms of the Decree are implemented. At least 30 Days prior to such transfer, Defendant shall provide a copy of this Consent Decree to the proposed transferee and shall simultaneously provide written notice of the prospective transfer, together with a copy of the proposed written agreement, to EPA Region 7 and the United States Department of Justice, in accordance with Section XIII (Notices). Any attempt to transfer ownership or operation of the Facility without complying with this Paragraph constitutes a violation of this Decree.

5.     Defendant shall provide a copy of this Consent Decree to all officers, employees, and agents whose duties might reasonably include compliance with any provision of this Decree, as well as to any contractor retained to perform work required under this Consent Decree. Defendant shall condition any such contract upon performance of the work in conformity with the terms of this Consent Decree.

6.     In any action to enforce this Consent Decree, Defendant shall not raise as a defense the failure by any of its officers, directors, employees, agents, or contractors to take any actions necessary to comply with the provisions of this Consent Decree.

## III.     DEFINITIONS

7.     Terms used in this Consent Decree that are defined in the CWA, RCRA, regulations promulgated pursuant to the CWA, or regulations authorized by RCRA shall have the meanings assigned to them in the CWA or RCRA or such regulations, unless otherwise provided in this Decree. Whenever the terms set forth below are used in this Consent Decree, the following definitions shall apply:

"Complaint" shall mean the complaint filed by the United States in this action;

"Consent Decree" or "Decree" shall mean this Decree and all appendices attached hereto listed in Section XXIII (Appendices);

"Day" shall mean a calendar day unless expressly stated to be a business day. In computing any period of time under this Consent Decree, where the last day would fall on a Saturday, Sunday, or federal holiday, the period shall run until the close of business of the next business day;

"Defendant" or "Dyno" shall mean Dyno Nobel, Inc.;

"EPA" shall mean the United States Environmental Protection Agency and any of its successor departments or agencies;

"Effective Date" shall have the definition provided in Section XIV (Effective Date).

2

"Facilities" shall mean Defendant's facilities located in Carthage, Missouri and Louisiana, Missouri.

"Legacy Outfall" shall mean any pipe, culvert or manmade conveyance or other point source that was previously permitted, is currently permitted or is currently discharging process wastewater, stormwater, steam condensate, or any combination thereof, other than the five discharge points specifically identified in Paragraph 12.a. "Legacy Outfall" does not include the steam system relief valves that intermittently discharge small amounts of condensate to the ground or the related infrastructure including steam traps, compressed air water traps and containment drain pipes.

"Paragraph" shall mean a portion of this Decree identified by an Arabic numeral;

"Parties" shall mean the United States and Defendant;

"Permit" shall mean the NPDES permit issued by the state numbered MO0002402 for the Carthage facility and MO0105783 for the Louisiana facility.

"Process wastewater" shall mean all water generated, produced or collected that is not stormwater including, but not limited to process water from the production buildings, contact cooling water, non-contact cooling water, boiler blowdown, wet scrubber water, air conditioner condensate and laundry wastewater.

"Section" shall mean a portion of this Decree identified by a roman numeral;

"State" shall mean the State of Missouri.

"United States" shall mean the United States of America, acting on behalf of EPA;

## IV.    CIVIL PENALTY

8.      Within 30 Days after the Effective Date, Defendant shall pay the sum of $2,900,000 as a civil penalty, together with interest accruing from October 18, 2019, at the rate specified in 28 U.S.C. § 1961 as of the date of lodging.

9.      Defendant shall pay the civil penalty due by FedWire Electronic Funds Transfer ("EFT") to the U.S. Department of Justice account, in accordance with instructions provided to Defendant by the Financial Litigation Unit ("FLU") of the United States Attorney's Office for the Western District of Missouri after the Effective Date. The payment instructions provided by the FLU will include a Consolidated Debt Collection System ("CDCS") number, which Defendant shall use to identify all payments required to be made in accordance with this Consent Decree. The FLU will provide the payment instructions to:

Scott Bell, Senior Corporate Counsel
Dyno Nobel Inc.
2795 East Cottonwood Parkway, Suite 500

3

Salt Lake City, UT 84121
(801) 328-6511
Scott.Bell@am.dynonobel.com

on behalf of Defendant. Defendant may change the individual to receive payment instructions on its behalf by providing written notice of such change to the United States and EPA in accordance with Section XIII (Notices).

At the time of payment, Defendant shall send notice that payment has been made: (i) to EPA via email at cinwd_acctsreceivable@epa.gov or via regular mail at EPA Cincinnati Finance Office, 26 W. Martin Luther King Drive, Cincinnati, Ohio 45268; (ii) to the United States via email or regular mail in accordance with Section XIII; and (iii) to EPA in accordance with Section XIII. Such notice shall state that the payment is for the civil penalty owed pursuant to the Consent Decree in United States v. Dyno Nobel, Inc. and shall reference the civil action number, CDCS Number and DOJ case number 90-5-1-1-11542.

10.     Defendant shall not deduct any penalties paid under this Decree pursuant to this Section or Section VII (Stipulated Penalties) in calculating its federal income tax.

## V.     COMPLIANCE REQUIREMENTS

11.     At the Facilities, Defendant shall comply with the requirements of the CWA, RCRA, the regulations and policies promulgated thereunder and its NPDES permits.

12.     **Carthage Facility Sewer Separation**.

a.     By August 1, 2020, Dyno shall separate stormwater flow from process wastewater flow and consolidate piping to (1) four discharge points for stormwater and (2) a separate single discharge point for process wastewater, reached via hard-piped, underground pipe.

b.     Following the outfall consolidation described above, any remaining Legacy Outfalls from which discharge is observed will be permanently closed.

13.     **Carthage Facility Process Wastewater Treatment**.

a.     Beginning no later than August 1, 2020, Dyno shall ship high-strength wastewater from the Chub Emulsion Building and Paperwrap Building (identified in Appendix C) off-site to the Springfield publicly owned treatment works (POTW) and shall route all remaining process wastewater to the discharge point for process wastewater described in Paragraph 12.

b.     By January 15, 2020, Dyno shall provide to EPA for approval pursuant to Paragraph 26, its plan for the treatment of its process wastewater in accordance with Paragraphs 12.a and 13.a, including the on-site changes that will take place.

c.     By June 1, 2020, Dyno shall provide to EPA for approval, pursuant to Paragraph 26, a plan for a contingency option that could be implemented within 90 Days

4

if the Missouri Department of Natural Resources ("MDNR") does not approve Dyno's plan or the Springfield facility no longer accepts Dyno's wastewater. Upon EPA's approval of the contingency plan, if at any future date either of the foregoing conditions occurs, Dyno will implement the contingency plan within 90 Days.

14. **Complete Sewer Survey at the Louisiana Facility**. By October 1, 2020, Dyno shall perform a Sewer Survey that includes:

    a.    camera inspection from outfall 008 out to former outfall 001 (the Mississippi River discharge point) as is practicable; and

    b.    dye testing on the remainder of the Louisiana Facility process and stormwater sewers from the production area (which includes the truck and rail loadout and storage areas).

15. Within 6 months after completion of the sewer survey, Dyno shall submit to EPA a Sewer Survey Report that 1) describes in detail the findings and identifications of the Sewer Survey required above, 2) describes any corrective actions to be taken in response to the findings to minimize any unpermitted releases of materials to Buffalo Creek or the Mississippi River revealed by the sewer survey and to route any unpermitted flows of such materials from the Louisiana Facility production area to the outfalls consistent with the NPDES permit. The Sewer Survey Report shall be prepared and signed by a professional engineer and shall provide estimates of the capital cost of each proposed corrective measure and a schedule for the construction and implementation of all proposed corrective measures. EPA, after consultation with the State, shall approve, approve with modifications, or disapprove the proposed corrective measures and the proposed schedule in the Sewer Survey Report in accordance with Paragraph 26. Upon EPA approval of the proposed corrective measures and schedule, Dyno shall implement the measures described in the Sewer Survey Report in accordance with the approved schedule.

16. **Stormwater Management Program at the Carthage Facility**. Within 90 Days of the Effective Date, Dyno shall submit an updated Stormwater Pollution Prevention Plan establishing a Stormwater Management Program for approval that will include the following:

    a.    A schedule for the installation and operation of any corrective measures that may be required to ensure that all stormwater in current and former process areas is routed to one of four existing outfalls (007, 008, 009, 004) by no later than July 31, 2020;

    b.    A Good Housekeeping Program to minimize spills and releases of pollutants from discharging into Center Creek and its tributaries. The Good Housekeeping Program shall include at a minimum: i) best management practices to minimize contamination of stormwater and steam condensate with pollutants; ii) weekly inspections of each production area, load out areas, storage areas; iii) the containment and clean up procedure when spills occur; and iv) logs and findings of each inspection shall be maintained on site in accordance with Section X (Information Collection and Retention) of this Decree. Best management practices do not include any collection or conveyance of steam condensate;

c.      EPA, after consultation with the State, shall approve, approve with modifications, or disapprove the proposed Plan and the proposed schedule for installing any corrective measures required by subparagraph 16.a. Upon EPA approval of the proposed Plan and schedule, Dyno shall implement the measures described in the updated Stormwater Pollution Prevention Plan in accordance with the approved schedule.

17.      **Stormwater Management Program at the Louisiana Facility**. Within 90 Days of the Effective Date, Dyno shall submit an updated Stormwater Pollution Prevention Plan establishing a Stormwater Management Program for approval that will include the following:

a.      A Good Housekeeping Program to minimize spills and releases of pollutants from discharging into Buffalo Creek, the Mississippi River, and its tributaries. The Good Housekeeping Program shall include at a minimum: i) best management practices to minimize contamination of stormwater and steam condensate with pollutants; ii) weekly inspections of each production area, load out areas, storage areas; iii) the containment and clean up procedure when spills occur; and iv) logs and findings of each inspection shall be maintained on site in accordance with Section X (Information Collection and Retention) of this Decree. Best management practices do not include any collection or conveyance of steam condensate;

b.      A schedule for the installation and/or operation of control practices, including staff procedures, to minimize the amount of prill spilled on to the ground throughout the Facility and to promptly clean up any prill that does spill anywhere in the facility that is exposed to precipitation to minimize any exposure to precipitation.

c.      EPA, after consultation with the State, shall approve, approve with modifications, or disapprove the proposed Plan and the proposed schedule for implementing the control practices required by subparagraph 17.b. Upon EPA approval of the proposed Plan and schedule, Dyno shall implement the measures described in the updated Stormwater Pollution Prevention Plan in accordance with the approved schedule.

18.      **Various Wastewater Treatment at the Carthage Facility**.

a.      Dyno shall operate and maintain a pH adjustment system for the powerhouse boilers, according to the operation and maintenance plan described in Appendix A.

b.      Dyno shall operate and maintain existing carbon filtration systems for laundry wastewater and for process wastewater at the Cast Booster Building (identified in Appendix C), according to the operation and maintenance plan described in Appendix B.

19.      **Effluent Monitoring Requirements for the Carthage Facility**.

a.      In addition to the monitoring required by its NPDES permit, Dyno shall monitor the following constituents after August 1, 2020:

| Outfall | Parameter | Frequency | Sample Type |
|---|---|---|---|
| Stormwater-only outfalls (007, 008, 009, 004) | Flow | ** | 24-hour total |
| | Precipitation | Daily | 24-hour total |
| | Nitroglycerin (NG) | ** | Grab |
| | Ethylene Glycol Dinitrate (EGDN) | ** | Grab |
| | Pentaerythritoltetranitrate (PETN) | ** | Grab |
| | 2,4,6-Trinitrotoluene (TNT) | ** | Grab |
| | Ammonia as N | ** | Grab |
| | Nitrate as N | ** | Grab |
| New Process Wastewater Outfall | Flow | Once/weekday | 24-hour total |
| | Nitroglycerin (NG) | Weekly | Grab |
| | Ethylene Glycol Dinitrate (EGDN) | Weekly | Grab |
| | Pentaerythritoltetranitrate (PETN) | Weekly | Grab |
| | 2,4,6-Trinitrotoluene (TNT) | Weekly | Grab |
| | Ammonia as N | Weekly | Grab |
| | Nitrate as N | Weekly | Grab |
| Legacy Outfalls* | Flow | Once/weekday and ** | 24-hour total |
| | Nitroglycerin (NG) | Weekly and ** | Grab |
| | Ethylene Glycol Dinitrate (EGDN) | Weekly and ** | Grab |
| | Pentaerythritoltetranitrate (PETN) | Weekly and ** | Grab |
| | 2,4,6-Trinitrotoluene (TNT) | Weekly and ** | Grab |
| | Ammonia as N | Weekly and ** | Grab |
| | Nitrate as N | Weekly and ** | Grab |

\* The Legacy Outfalls no longer require monitoring if demonstrated to EPA to be tied in, closed, or capped (no longer potential discharge points).

\*\* Samples shall be collected at least once per calendar month, within 24 hours of a 0.1-inch rain that occurs at least 72 hours from the previously measurable precipitation event.

      b.     If Dyno can demonstrate that, for one calendar year, the monitoring results for its stormwater discharges at a given outfall have remained below the following monthly monitoring threshold for a given parameter for one calendar year, Dyno will no longer be required to test for that parameter at that outfall.

      (1)     Nitroglycerin (NG) – 0.2 mg/L

      (2)     Ethylene Glycol Dinitrate (EGDN) – 1.1 mg/L

      (3)     Ammonia as N – 4.0 mg/L

      (4)     Nitrate as N – 10 mg/L

      (5)     PETN – 14.62 mg/L

      (6)     TNT – 0.557 mg/L

Case 3:19-cv-05031-MDH   Document 38-1   Filed 02/27/20   Page 8 of 41

20.     **Pollutant Source Investigation at the Carthage Facility**. Within 60 Days of the Effective Date, Dyno shall investigate the source of Zinc at Outfall 010 and submit the results of such investigation for approval. Within 60 Days of approval of the source investigation, Dyno will submit a corrective action plan for approval that either removes the source of Zinc or treats the wastewater containing Zinc to reduce levels to permitted concentrations or below, prior to discharge. The plan must contain a schedule that results in the removal of the source of Zinc or the treatment of the wastewater by no later than one year from the Effective Date.

21.     **Hazardous Waste Determinations at the Carthage Facility**. The first time the following solid wastes are generated by Defendant after the Effective Date, Defendant shall make a hazardous waste determination in accordance with 10 C.S.R. 25-5.262, referencing 40 C.F.R. § 262.11, a:

        a.      Waste waters where trinitrotoluene ("TNT") is used, stored, or processed;

        b.      Wastewaters that are not authorized under a NPDES permit;

        c.      Sludge from air pollution control equipment;

        d.      Disposed waste from explosives repackaging operations;

        e.      Disposed personal protective equipment;

        f.      Solids removed from the high strength wastewater stream prior to off-site shipment as detailed in Paragraph 13; and

        g.      Spent carbon filters from the carbon filtration system referenced in Paragraph 18.b.

22.     Each hazardous waste determination shall include documentation of the following:

        a.      A description of the process that generated the waste;

        b.      A determination whether the waste has been excluded from regulation under 40 C.F.R. Part 261;

        c.      A determination whether the waste has been listed in Subpart D of 40 C.F.R. Part 261; and

        d.      A determination whether the waste is identified in 40 C.F.R. Part 261, Subpart C. To determine whether the waste exhibits any of the characteristics in Subpart C, the waste may need to be analyzed using the procedure set forth in Subpart C of 40 C.F.R. Part 261, or by applying knowledge of the waste characteristics based upon the material or processes used. If knowledge of the process is used, Defendant must provide a detailed explanation regarding the basis for this knowledge and its reasoning.

23. **Sampling and Cleanup Plan for the Carthage Facility**.

a.      Within 120 Days of the Effective Date, Defendant shall submit to EPA a Soil Sampling Plan ("Sampling Plan") for approval in accordance with Paragraph 26. The Sampling Plan shall include a plan and procedures for obtaining and analyzing soil samples at the following locations: around the Chub Emulsion Building and Cast Booster Building (identified in Appendix C); at least every one hundred (100) feet along the pathway from outfall 003 to outfall 004; every one hundred (100) feet along the rail line through the production areas; and every one hundred (100) feet along the nitroglycerine line. The Sampling Plan shall also include a Quality Assurance Project Plan ("QAPP") and a Health and Safety Plan ("HASP").

b.      Upon approval of the Sampling Plan by EPA, Defendant shall implement the terms and conditions of the Sampling Plan.

c.      Within 90 Days after receiving the analyses identified in the Sampling Plan, Defendant shall submit to EPA, for approval in accordance with Paragraph 26, a Sampling Report and, if necessary, a Cleanup Plan that details cleanup activities to be conducted at the facility (along with a schedule for completion of all activities) in order to achieve the following contaminant levels (except that Defendant may submit to EPA, for approval in accordance with Paragraph 26, risk-based cleanup levels based on site-specific conditions for any of the following contaminants) that will be allowed once clean up concludes:

(1)      Nitrates (reported as nitrogen) shall be cleaned up to a level of (a) 85 mg/kg NO3-N in the upper 8 inches of soil and 40 mg/kg NO3-N below 8 inches in depth in unvegetated areas; and (b) 200 mg/kg NO3-N in the upper 24 inches of soil and 40 mg/kg NO3-N below 24 inches in depth in vegetated areas.

(2)      TNT, PETN, NG, and any other contaminants found during Sampling Plan activities, shall be cleaned up to EPA regional screening levels for industrial soil, available at https://semspub.epa.gov/work/HQ/199432.pdf.

d.      Upon approval of the Cleanup Plan by EPA, Defendant shall undertake and complete the agreed upon cleanup activities in accordance with the approved schedule.

e.      Within 90 Days after completion of all the cleanup activities identified in the Cleanup Plan, Defendant shall submit a Final Confirmation Report, including sampling and analysis of the work areas, demonstrating that contamination in the areas of concern has been successfully mitigated. This report shall include a description of each contaminated area, the name of the chemical and/or waste associated with each contaminated area, the amount of waste generated during the remediation, photographs showing the contaminated area and the remediation, and manifests, receipts, and/or bills of lading for each waste disposed of in the remediation.

24. **Site Characterization Report for the Carthage Facility**. Within 120 Days of the Effective Date, Defendant shall submit to EPA, with a copy to MDNR, a Site

9

Characterization Report ("Characterization Report") that comprehensively describes all processes that have and/or are leaking, spilling, and/or otherwise releasing products, used oil, solid waste, and/or hazardous waste at the Carthage facility. The Characterization Report shall include a description of all the current industrial processes at the facility, including the location of each process, the products produced, and any potential pollutants of concern resulting from that process (including, but not limited to, TNT, PETN, ammonia, nitrates, reactive chemicals, and ignitable chemicals). The Characterization Report shall also include any known historical information about past processes at the facility and their location(s) within the facility. The Characterization Report shall not be subject to EPA approval under Paragraph 26.

25. **Installation of baghouse outside of Dope Building at the Carthage Facility**. Dyno shall supplement the enhanced stormwater management outside the Dope Building at the Carthage facility (identified in Appendix C) by proposing a Baghouse Plan to mitigate dust emissions for submission to EPA within 30 Days of the Effective Date, including a schedule for implementation. EPA, after consultation with the State, shall approve, approve with modifications, or disapprove the proposed Baghouse Plan and the proposed schedule for installing the corrective measures required by the Plan. Upon EPA approval of the proposed Baghouse Plan and schedule, Dyno shall implement the measures described in accordance with the approved schedule.

26. **Approval of Deliverables**. After review of any plan, report, or other item that is required to be submitted pursuant to this Consent Decree, EPA, after consultation with the State, shall in writing: (a) approve the submission; (b) approve the submission upon specified conditions; (c) approve part of the submission and disapprove the remainder; or (d) disapprove the submission.

      a. If the submission is approved pursuant to Paragraph 26, Defendant shall take all actions required by the plan, report, or other item, in accordance with the schedules and requirements of the plan, report, or other item, as approved. If the submission is conditionally approved or approved only in part pursuant to Paragraph 26(b) or (c), Defendant shall, upon written direction from EPA (after consultation with the State), take all actions required by the approved plan, report, or other item that EPA (after consultation with the State) determines are technically severable from any disapproved portions, subject to Defendant's right to dispute only the specified conditions or the disapproved portions, under Section IX (Dispute Resolution).

      b. If the submission is disapproved in whole or in part pursuant to Paragraph 26(c) or (d), Defendant shall, within 45 Days or such other time as the Parties agree to in writing, correct all deficiencies and resubmit the plan, report, or other item, or disapproved portion thereof, for approval, in accordance with this Paragraph. If the resubmission is approved in whole or in part, Defendant shall proceed in accordance with Paragraph 26.a.

      c. If a resubmitted plan, report, or other item, or portion thereof, is disapproved in whole or in part, EPA (after consultation with the State) may again require Defendant to correct any deficiencies, in accordance with this Paragraph, or may itself correct any deficiencies subject to Defendant's right to invoke Dispute Resolution

and the right of EPA to seek stipulated penalties as provided in this Paragraph.

d. Any stipulated penalties applicable to the original submission, as provided in Section VII (Stipulated Penalties), shall accrue during the 45 Day period or other specified period, but shall not be payable unless the resubmission is untimely or is disapproved in whole or in part; provided that, if the original submission was so deficient as to constitute a material breach of Defendant's obligations under this Decree, the stipulated penalties applicable to the original submission shall be due and payable notwithstanding any subsequent resubmission.

27. **Permits**. Where any compliance obligation under this Section requires Defendant to obtain a federal, state, or local permit or approval, Defendant shall submit timely and complete applications and take all other actions necessary to obtain all such permits or approvals. Defendant may seek relief under the provisions of Section VIII (Force Majeure) for any delay in the performance of any such obligation resulting from a failure to obtain, or a delay in obtaining, any permit or approval required to fulfill such obligation, if Defendant has submitted timely and complete applications and has taken all other actions necessary to obtain all such permits or approvals.

## VI. REPORTING REQUIREMENTS

28. Defendant shall submit the following quarterly reports:

a. **Quarterly reports**. By January 31st, April 30th, July 31st, and October 31st of each year after the lodging of this Consent Decree, until termination of this Decree pursuant to Section XVII, Defendant shall submit electronically a quarterly report for the preceding three months that shall include:

  (1) the status of any investigation, construction, or compliance measures taken pursuant to Section V (Compliance Requirements); problems encountered or anticipated, together with implemented or proposed solutions; status of permit applications; and reports to state agencies; and a summary of costs incurred since the previous report;

  (2) a list of the remaining compliance milestones and an update on timing, including an estimate of the percent completion of each compliance milestone; and

  (3) the results of effluent monitoring taken pursuant to Paragraph 19.

b. If Defendant violates, or has reason to believe that it may violate, any requirement of this Consent Decree, Defendant shall notify the United States of such violation and its likely duration, in writing, within ten working Days of the Day Defendant first becomes aware of the violation, with an explanation of the violation's likely cause and of the remedial steps taken, or to be taken, to prevent or minimize such violation. If the cause of a violation cannot be fully explained at the time the report is

due, Defendant shall so state in the report. Defendant shall investigate the cause of the violation and shall then submit an amendment to the report, including a full explanation of the cause of the violation, within 30 Days of the Day Defendant becomes aware of the cause of the violation. Nothing in this Paragraph or the following Paragraph relieves Defendant of its obligation to provide the notice required by Section VIII (Force Majeure).

29.     Whenever any violation of this Consent Decree or of any applicable permits or any other event affecting Defendant's performance under this Decree, or the performance of its Facility, may pose an immediate threat to the public health or welfare or the environment, Defendant shall notify EPA and the State orally or by electronic transmission as soon as possible, but no later than 24 hours after Defendant first knew of the violation or event. This procedure is in addition to the requirements set forth in the preceding Paragraph.

30.     All reports shall be submitted to the persons designated in Section XIII (Notices).

31.     **<u>Certification</u>**. Each report submitted by Defendant under this Section shall be signed by an official of the submitting party and include the following certification:

I certify under penalty of law that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted. Based on my inquiry of the person or persons who manage the system, or those persons directly responsible for gathering the information, the information submitted is, to the best of my knowledge and belief, true, accurate, and complete. I have no personal knowledge that the information submitted is other than true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations.

This certification requirement does not apply to emergency or similar notifications where compliance would be impractical.

32.     The reporting requirements of this Consent Decree do not relieve Defendant of any reporting obligations required by the CWA, RCRA, regulations promulgated pursuant to the CWA, or regulations authorized by RCRA, or by any other federal, state, or local law, regulation, permit, or other requirement.

33.     Any information provided pursuant to this Consent Decree may be used by the United States in any proceeding to enforce the provisions of this Consent Decree and as otherwise permitted by law.

VII.    STIPULATED PENALTIES

34.     Defendant shall be liable for stipulated penalties to the United States for violations of this Consent Decree as specified below, unless excused under Section VIII (Force Majeure). A violation includes failing to perform any obligation required by the terms of this Decree, including any work plan or schedule approved under this Decree, according to all

12

applicable requirements of this Decree and within the specified time schedules established by or approved under this Decree.

35. **Late Payment of Civil Penalty**. If Defendant fails to pay the civil penalty required to be paid under Section IV (Civil Penalty) when due, Defendant shall pay a stipulated penalty of $ 2,000 per Day for each Day that the payment is late.

36. **Effluent Limits Violations**. The following stipulated penalties shall accrue per violation per Day for each violation of an effluent limitation prior to August 1, 2020:

| Penalty Per Violation Per Day | Degree of Exceedance |
|---|---|
| $1,500 | below 20% |
| $3,000 | 20-50% |
| $4,500 | 50% or more |

The following stipulated penalties shall accrue per violation per Day for each violation of an effluent limitation on or after August 1, 2020:

| Penalty Per Violation Per Day | Degree of Exceedance |
|---|---|
| $3,000 | below 20% |
| $6,000 | 20-50% |
| $9,000 | 50% or more |

37. **Pollutants in Stormwater Discharge**.

    a.    If Dyno exceeds benchmark thresholds listed below for a given parameter in its stormwater testing after pipe consolidation at the Carthage facility, it will have 60 Days to identify the source of the exceedance and remedy the problem:

        (1)    Nitroglycerin (NG) – 0.2 mg/L

        (2)    Ethylene Glycol Dinitrate (EGDN) – 1.1 mg/L

        (3)    Pentaerythritoltetranitrate (PETN) – 14.62 mg/L

        (4)    2,4,6-Trinitrotoluene (TNT) – 0.557 mg/L

        (5)    Ammonia as N – 4.0 mg/L

        (6)    pH – less than 6.5 or greater than 9.0

    b.    If within that 60 Day period Dyno can address the source of the exceedance so that there is no longer an exceedance of the benchmark thresholds set forth in subparagraph 37.a, no stipulated penalties will be assessed.

38. If exceedances continue beyond the 60 Day grace period, Dyno will be subject to stipulated penalties in the amount of $5,000 per Day per parameter that will accrue from the date of the original exceedance.

39.     **Compliance Milestones**. The following stipulated penalties shall accrue per violation per Day for each violation of the requirements identified in Section V (Compliance Requirements):

| Penalty Per Violation Per Day | Period of Noncompliance |
|---|---|
| $750 | 1st through 14th Day |
| $1,500 | 15th through 30th Day |
| $3,000 | 31st Day and beyond |

40.     **Reporting Requirements**. The following stipulated penalties shall accrue per violation per Day for each violation of the reporting requirements of Section VI:

| Penalty Per Violation Per Day | Period of Noncompliance |
|---|---|
| $250 | 1st through 14th Day |
| $500 | 15th through 30th Day |
| $1,000 | 31st Day and beyond |

41.     Defendant shall pay any stipulated penalty within 30 Days of receiving the United States' written demand.

42.     The United States may in the unreviewable exercise of its discretion, reduce or waive stipulated penalties otherwise due it under this Consent Decree.

43.     Stipulated penalties shall continue to accrue as provided in Paragraph 60, during any Dispute Resolution, but need not be paid until the following:

        a.     If the dispute is resolved by agreement of the Parties or by a decision of EPA that is not appealed to the Court, Defendant shall pay accrued penalties determined to be owing, together with interest, to the United States within 30 Days of the effective date of the agreement or the receipt of EPA's decision or order.

        b.     If the dispute is appealed to the Court and the United States prevails in whole or in part, Defendant shall pay all accrued penalties determined by the Court to be owing, together with interest, within 60 Days of receiving the Court's decision or order, except as provided in Paragraph 43.c, below.

        c.     If any Party appeals the District Court's decision, Defendant shall pay all accrued penalties determined to be owing, together with interest, within 15 Days of receiving the final appellate court decision.

44.     Defendant shall pay stipulated penalties owing to the United States in the manner set forth and with the confirmation notices required by Paragraph 9, except that the transmittal letter shall state that the payment is for stipulated penalties and shall state for which violation(s) the penalties are being paid.

45.     If Defendant fails to pay stipulated penalties according to the terms of this Consent Decree, Defendant shall be liable for interest on such penalties, as provided for in 28 U.S.C. § 1961, accruing as of the date payment became due. Nothing in this Paragraph shall

14

be construed to limit the United States from seeking any remedy otherwise provided by law for Defendant's failure to pay any stipulated penalties.

46.     The payment of penalties and interest, if any, shall not alter in any way Defendant's obligation to complete the performance of the requirements of this Consent Decree.

47.     **Non-Exclusivity of Remedy**. Stipulated penalties are not the United States' exclusive remedy for violations of this Consent Decree. Subject to the provisions of Section XI (Effect of Settlement/Reservation of Rights), the United States expressly reserves the right to seek any other relief it deems appropriate for Defendant's violation of this Decree or applicable law, including but not limited to an action against Defendant for statutory penalties, additional injunctive relief, mitigation or offset measures, and/or contempt. However, the amount of any statutory penalty assessed for a violation of this Consent Decree shall be reduced by an amount equal to the amount of any stipulated penalty assessed and paid pursuant to this Consent Decree.

## VIII.   FORCE MAJEURE

48.     "Force majeure," for purposes of this Consent Decree, is defined as any event arising from causes beyond the control of Defendant, of any entity controlled by Defendant, or of Defendant's contractors, that delays or prevents the performance of any obligation under this Consent Decree despite Defendant's best efforts to fulfill the obligation. The requirement that Defendant exercise "best efforts to fulfill the obligation" includes using best efforts to anticipate any potential force majeure event and best efforts to address the effects of any potential force majeure event (a) as it is occurring and (b) following the potential force majeure, such that the delay and any adverse effects of the delay are minimized. "Force Majeure" does not include Defendant's financial inability to perform any obligation under this Consent Decree.

49.     If any event occurs or has occurred that may delay the performance of any obligation under this Consent Decree, whether or not caused by a force majeure event, Defendant shall provide notice orally or by electronic transmission to EPA, within 72 hours of when Defendant first knew that the event might cause a delay. Within seven Days thereafter, Defendant shall provide in writing to EPA an explanation and description of the reasons for the delay; the anticipated duration of the delay; all actions taken or to be taken to prevent or minimize the delay; a schedule for implementation of any measures to be taken to prevent or mitigate the delay or the effect of the delay; Defendant's rationale for attributing such delay to a force majeure event if it intends to assert such a claim; and a statement as to whether, in the opinion of Defendant, such event may cause or contribute to an endangerment to public health, welfare or the environment. Defendant shall include with any notice all available documentation supporting the claim that the delay was attributable to a force majeure. Failure to comply with the above requirements shall preclude Defendant from asserting any claim of force majeure for that event for the period of time of such failure to comply, and for any additional delay caused by such failure. Defendant shall be deemed to know of any circumstance of which Defendant, any entity controlled by Defendant, or Defendant's contractors knew or should have known.

50.     If EPA agrees that the delay or anticipated delay is attributable to a force majeure event, the time for performance of the obligations under this Consent Decree that are affected by the force majeure event will be extended by EPA for such time as is necessary to complete those

15

obligations. An extension of the time for performance of the obligations affected by the force majeure event shall not, of itself, extend the time for performance of any other obligation. EPA will notify Defendant in writing of the length of the extension, if any, for performance of the obligations affected by the force majeure event.

51.     If EPA does not agree that the delay or anticipated delay has been or will be caused by a force majeure event, EPA will notify Defendant in writing of its decision.

52.     If Defendant elects to invoke the dispute resolution procedures set forth in Section IX (Dispute Resolution), it shall do so no later than 15 Days after receipt of EPA's notice. In any such proceeding, Defendant shall have the burden of demonstrating by a preponderance of the evidence that the delay or anticipated delay has been or will be caused by a force majeure event, that the duration of the delay or the extension sought was or will be warranted under the circumstances, that best efforts were exercised to avoid and mitigate the effects of the delay, and that Defendant complied with the requirements of Paragraphs 48 and 49. If Defendant carries this burden, the delay at issue shall be deemed not to be a violation by Defendant of the affected obligation of this Consent Decree identified to EPA and the Court.

## IX.     DISPUTE RESOLUTION

53.     Unless otherwise expressly provided for in this Consent Decree, the dispute resolution procedures of this Section shall be the exclusive mechanism to resolve disputes arising under or with respect to this Consent Decree. Defendant's failure to seek resolution of a dispute under this Section shall preclude Defendant from raising any such issue as a defense to an action by the United States to enforce any obligation of Defendant arising under this Decree.

54.     **Informal Dispute Resolution**. Any dispute subject to Dispute Resolution under this Consent Decree shall first be the subject of informal negotiations. The dispute shall be considered to have arisen when Defendant sends the United States a written Notice of Dispute. Such Notice of Dispute shall state clearly the matter in dispute. The period of informal negotiations shall not exceed 20 Days from the date the dispute arises, unless that period is modified by written agreement. If the Parties cannot resolve a dispute by informal negotiations, then the position advanced by the United States shall be considered binding unless, within 20 Days after the conclusion of the informal negotiation period, Defendant invokes formal dispute resolution procedures as set forth below.

55.     **Formal Dispute Resolution**. Defendant shall invoke formal dispute resolution procedures, within the time period provided in the preceding Paragraph, by serving on the United States a written Statement of Position regarding the matter in dispute. The Statement of Position shall include, but need not be limited to, any factual data, analysis, or opinion supporting Defendant's position and any supporting documentation relied upon by Defendant.

56.     The United States shall serve its Statement of Position within 45 Days of receipt of Defendant's Statement of Position. The United States' Statement of Position shall include, but need not be limited to, any factual data, analysis, or opinion supporting that position and any supporting documentation relied upon by the United States. The United States' Statement of

Position shall be binding on Defendant, unless Defendant files a motion for judicial review of the dispute in accordance with the following Paragraph.

57.     Defendant may seek judicial review of the dispute by filing with the Court and serving on the United States, in accordance with Section XIII (Notices), a motion requesting judicial resolution of the dispute. The motion must be filed within ten Days of receipt of the United States' Statement of Position pursuant to the preceding Paragraph. The motion shall contain a written statement of Defendant's position on the matter in dispute, including any supporting factual data, analysis, opinion, or documentation, and shall set forth the relief requested and any schedule within which the dispute must be resolved for orderly implementation of the Consent Decree.

58.     The United States shall respond to Defendant's motion within the time period allowed by the Local Rules of this Court. Defendant may file a reply memorandum, to the extent permitted by the Local Rules.

59.     **<u>Standard of Review</u>**. Except as otherwise provided in this Consent Decree, in any dispute brought under Paragraph 55, Defendant shall have the burden of demonstrating that its position complies with this Consent Decree and that it is entitled to relief under applicable principles of law. The United States reserves the right to argue that its position is reviewable only on the administrative record and must be upheld unless arbitrary and capricious or otherwise not in accordance with law.

60.     The invocation of dispute resolution procedures under this Section shall not, by itself, extend, postpone, or affect in any way any obligation of Defendant under this Consent Decree, unless and until final resolution of the dispute so provides. Stipulated penalties with respect to the disputed matter shall continue to accrue from the first Day of noncompliance, but payment shall be stayed pending resolution of the dispute as provided in Paragraph 43. If Defendant does not prevail on the disputed issue, stipulated penalties shall be assessed and paid as provided in Section VII (Stipulated Penalties).

## X.     INFORMATION COLLECTION AND RETENTION

61.     The United States and its representatives, including attorneys, contractors, and consultants, shall have the right of entry into any facility covered by this Consent Decree, at all reasonable times, upon presentation of credentials, to:

      a.     monitor the progress of activities required under this Consent Decree;

      b.     verify any data or information submitted to the United States in accordance with the terms of this Consent Decree;

      c.     obtain samples and, upon request, splits of any samples taken by Defendant or its representatives, contractors, or consultants;

      d.     obtain documentary evidence, including photographs and similar data; and

      e.     assess Defendant's compliance with this Consent Decree.

17

62.     Upon request, Defendant shall provide EPA or its authorized representatives splits of any samples taken by Defendant. Upon request, EPA shall provide Defendant splits of any samples taken by EPA.

63.     Until five years after the termination of this Consent Decree, Defendant shall retain, and shall instruct its contractors and agents to preserve, all non-identical copies of all documents, records, or other information (including documents, records, or other information in electronic form) in its or its contractors' or agents' possession or control, or that come into its or its contractors' or agents' possession or control, and that relate in any manner to Defendant's performance of its obligations under this Consent Decree. This information-retention requirement shall apply regardless of any contrary corporate or institutional policies or procedures. At any time during this information-retention period, upon request by the United States, Defendant shall provide copies of any documents, records, or other information required to be maintained under this Paragraph.

64.     At the conclusion of the information-retention period provided in the preceding Paragraph, Defendant shall notify the United States at least 90 Days prior to the destruction of any documents, records, or other information subject to the requirements of the preceding Paragraph and, upon request by the United States, Defendant shall deliver any such documents, records, or other information to EPA. Defendant may assert that certain documents, records, or other information is privileged under the attorney-client privilege or any other privilege recognized by federal law. If Defendant asserts such a privilege, it shall provide the following: (a) the title of the document, record, or information; (b) the date of the document, record, or information; (c) the name and title of each author of the document, record, or information; (d) the name and title of each addressee and recipient; (e) a description of the subject of the document, record, or information; and (f) the privilege asserted by Defendant. However, no documents, records, or other information created or generated pursuant to the requirements of this Consent Decree shall be withheld on grounds of privilege.

65.     Defendant may also assert that information required to be provided under this Section is protected as Confidential Business Information ("CBI") under 40 C.F.R. Part 2. As to any information that Defendant seeks to protect as CBI, Defendant shall follow the procedures set forth in 40 C.F.R. Part 2.

66.     This Consent Decree in no way limits or affects any right of entry and inspection, or any right to obtain information, held by the United States pursuant to applicable federal laws, regulations, or permits, nor does it limit or affect any duty or obligation of Defendant to maintain documents, records, or other information imposed by applicable federal or state laws, regulations, or permits.

XI.     EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS

67.     This Consent Decree resolves the civil claims of the United States for the violations alleged in the Complaint filed in this action through the date of lodging. This Consent Decree also resolves the civil claims of the United States, at both the Carthage facility and the Louisiana facility, for failure to monitor under the Permit and for discharges of TSS, oil and

grease, ammonia, nitrate, nitroglycerin, BOD, E.coli, pH, and temperature in violation of the effluent limitations of the Permit through the date of lodging.

68.     The United States reserves all legal and equitable remedies available to enforce the provisions of this Consent Decree. Subject to Paragraph 67, this Consent Decree shall not be construed to limit the rights of the United States to obtain penalties or injunctive relief under the Act or implementing regulations, or under other federal laws, regulations, or permit conditions. The United States further reserves all legal and equitable remedies to address any imminent and substantial endangerment to the public health or welfare or the environment arising at, or posed by, Defendant's Facilities, whether related to the violations addressed in this Consent Decree or otherwise.

69.      In any subsequent administrative or judicial proceeding initiated by the United States for injunctive relief, civil penalties, other appropriate relief relating to the Facilities, Defendant shall not assert, and may not maintain, any defense or claim based upon the principles of waiver, res judicata, collateral estoppel, issue preclusion, claim preclusion, claim-splitting, or other defenses based upon any contention that the claims raised by the United States in the subsequent proceeding were or should have been brought in the instant case, except with respect to claims that have been specifically resolved pursuant to Paragraph 67.

70.     This Consent Decree is not a permit, or a modification of any permit, under any federal, State, or local laws or regulations. Defendant is responsible for achieving and maintaining complete compliance with all applicable federal, State, and local laws, regulations, and permits; and Defendant's compliance with this Consent Decree shall be no defense to any action commenced pursuant to any such laws, regulations, or permits, except as set forth herein. The United States does not, by its consent to the entry of this Consent Decree, warrant or aver in any manner that Defendant's compliance with any aspect of this Consent Decree will result in compliance with provisions of the CWA, RCRA, regulations promulgated pursuant to the CWA, or regulations authorized by RCRA, or with any other provisions of federal, State, or local laws, regulations, or permits.

71.     This Consent Decree does not limit or affect the rights of Defendant or of the United States against any third parties, not party to this Consent Decree, nor does it limit the rights of third parties, not party to this Consent Decree, against Defendant, except as otherwise provided by law.

72.     This Consent Decree shall not be construed to create rights in, or grant any cause of action to, any third party not party to this Consent Decree.

XII.    COSTS

73.     The Parties shall bear their own costs of this action, including attorneys' fees, except that the United States shall be entitled to collect the costs (including attorneys' fees) incurred in any action necessary to collect any portion of the civil penalty or any stipulated penalties due but not paid by Defendant.

## XIII.   NOTICES

74.     Unless otherwise specified in this Decree, whenever notifications, submissions, or communications are required by this Consent Decree, they shall be made in writing and addressed as follows:

| | |
|---|---|
| As to the United States by email: | eescdcopy.enrd@usdoj.gov<br>Re: DJ # 90-5-1-1-11542 |
| As to the United States by mail: | EES Case Management Unit<br>Environment and Natural Resources Division<br>U.S. Department of Justice<br>P.O. Box 7611<br>Washington, D.C. 20044-7611<br>Re: DJ # 90-5-1-1-11542 |
| As to EPA: | Director, Enforcement & Compliance Assurance Division<br>U.S. Environmental Protection Agency, Region 7<br>11201 Renner Boulevard<br>Lenexa, KS 66219<br>Bruno.Jodi@epa.gov<br>Buckner.Edwin@epa.gov<br><br>and<br><br>Regional Counsel<br>Office of Regional Counsel<br>U.S. Environmental Protection Agency, Region 7<br>11201 Renner Boulevard<br>Lenexa, KS 66219 |
| As to Defendant: | Luc Dugas<br>Senior Vice President – Manufacturing IS<br>2795 East Cottonwood Parkway, Suite 500<br>Salt Lake City, UT  84121<br>Luc.dugas@am.dynonobel.com<br><br>David Pierpoline<br>Senior Vice President – Nitrogen Plant Operation<br>2795 East Cottonwood Parkway, Suite 500<br>Salt Lake City, UT  84121<br>David.pierpoline@am.dynonobel.com<br><br>Legal Department<br>Dyno Nobel Inc. |

20

2795 East Cottonwood Parkway, Suite 500
Salt Lake City, UT  84121
legal@am.dynonobel.com

75.    Any Party may, by written notice to the other Parties, change its designated notice recipient or notice address provided above.

76.    Notices submitted pursuant to this Section shall be deemed submitted upon mailing, unless otherwise provided in this Consent Decree or by mutual agreement of the Parties in writing.

## XIV.   EFFECTIVE DATE

77.    The Effective Date of this Consent Decree shall be the date upon which this Consent Decree is entered by the Court or a motion to enter the Consent Decree is granted, whichever occurs first, as recorded on the Court's docket; provided, however, that Defendant hereby agrees that it shall be bound to perform duties scheduled to occur prior to the Effective Date. In the event the United States withdraws or withholds consent to this Consent Decree before entry, or the Court declines to enter the Consent Decree, then the preceding requirement to perform duties scheduled to occur before the Effective Date shall terminate.

## XV.    RETENTION OF JURISDICTION

78.    The Court shall retain jurisdiction over this case until termination of this Consent Decree, for the purpose of resolving disputes arising under this Decree or entering orders modifying this Decree, pursuant to Sections IX and XVI, or effectuating or enforcing compliance with the terms of this Decree.

## XVI.   MODIFICATION

79.    The terms of this Consent Decree, including any attached appendices, may be modified only by a subsequent written agreement signed by all the Parties. Where the modification constitutes a material change to this Decree, it shall be effective only upon approval by the Court.

80.    Any disputes concerning modification of this Decree shall be resolved pursuant to Section IX (Dispute Resolution), provided, however, that, instead of the burden of proof provided by Paragraph 59, the Party seeking the modification bears the burden of demonstrating that it is entitled to the requested modification in accordance with Federal Rule of Civil Procedure 60(b).

## XVII.   TERMINATION

81.    After Defendant has completed the requirements of Section V (Compliance Requirements); has thereafter maintained continuous satisfactory compliance with this Consent Decree for a period of three years; and has paid the civil penalty and any accrued stipulated penalties as required by this Consent Decree, Defendant may serve upon the United States a

Request for Termination, stating that Defendant has satisfied those requirements, together with all necessary supporting documentation.

82.     Following receipt by the United States of Defendant's Request for Termination, the Parties shall confer informally concerning the Request and any disagreement that the Parties may have as to whether Defendant has satisfactorily complied with the requirements for termination of this Consent Decree. If the United States agrees that the Decree may be terminated, the Parties shall submit, for the Court's approval, a joint stipulation terminating the Decree.

83.     If the United States does not agree that the Decree may be terminated, Defendant may invoke Dispute Resolution under Section IX. However, Defendant shall not seek Dispute Resolution of any dispute regarding termination until 30 Days after service of its Request for Termination.

## XVIII. PUBLIC PARTICIPATION

84.     This Consent Decree shall be lodged with the Court for a period of not less than 30 Days for public notice and comment in accordance with 28 C.F.R. § 50.7. The United States reserves the right to withdraw or withhold its consent if the comments regarding the Consent Decree disclose facts or considerations indicating that the Consent Decree is inappropriate, improper, or inadequate. Defendant consents to entry of this Consent Decree without further notice and agrees not to withdraw from or oppose entry of this Consent Decree by the Court or to challenge any provision of the Decree, unless the United States has notified Defendant in writing that it no longer supports entry of the Decree.

## XIX.   SIGNATORIES/SERVICE

85.     Each undersigned representative of Defendant and the Assistant Attorney General for the Environment and Natural Resources Division of the Department of Justice certifies that he or she is fully authorized to enter into the terms and conditions of this Consent Decree and to execute and legally bind the Party he or she represents to this document.

86.     This Consent Decree may be signed in counterparts, and its validity shall not be challenged on that basis. Defendant agrees to accept service of process by mail with respect to all matters arising under or relating to this Consent Decree and to waive the formal service requirements set forth in Rules 4 and 5 of the Federal Rules of Civil Procedure and any applicable Local Rules of this Court including, but not limited to, service of a summons. Defendant need not file an answer to the complaint in this action unless or until the Court expressly declines to enter this Consent Decree.

## XX.    INTEGRATION

87.     This Consent Decree constitutes the final, complete, and exclusive agreement and understanding among the Parties with respect to the settlement embodied in the Decree and supersedes all prior agreements and understandings, whether oral or written, concerning the settlement embodied herein. Other than deliverables that are subsequently submitted and

22

approved pursuant to this Decree, the Parties acknowledge that there are no representations, agreements, or understandings relating to the settlement other than those expressly contained in this Consent Decree.

## XXI.    FINAL JUDGMENT

88.    Upon approval and entry of this Consent Decree by the Court, this Consent Decree shall constitute a final judgment of the Court as to the United States and Defendant.

## XXII.   26 U.S.C. SECTION 162(f)(2)(A)(ii) IDENTIFICATION

89.    For purposes of the identification requirement of Section 162(f)(2)(A)(ii) of the Internal Revenue Code, 26 U.S.C. § 162(f)(2)(A)(ii), performance of Section II (Applicability), Paragraph 5; Section V (Compliance Requirements), Paragraphs 11-26.a and 27; Section VI (Reporting Requirements), Paragraphs 28 and 30-31; and Section X (Information Collection and Retention), Paragraphs 61-64 is restitution or required to come into compliance with law.

## XXIII. APPENDICES

90.    The following Appendices are attached to and part of this Consent Decree:

"Appendix A" is the pH adjustment system description; and

"Appendix B" is the carbon filtration system description.

"Appendix C" is a map of the Carthage facility.


Dated and entered this ___ day of _____, 2020.


_____
UNITED STATES DISTRICT JUDGE

23

FOR THE UNITED STATES OF AMERICA:

2/12/20
Date

NATHANIEL DOUGLAS
Deputy Section Chief
Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice

2/12/20
Date

KATHERINE L. MATTHEWS
Senior Counsel
DANICA ANDERSON GLASER
ZACHARY N. MOOR
Trial Attorneys
Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice

TIMOTHY A. GARRISON
United States Attorney
Western District of Missouri

CHARLES M. THOMAS
Assistant United States Attorney
Western District of Missouri

24

THE U.S. ENVIRONMENTAL PROTECTION AGENCY enters into this Consent Decree in the matter of *United States v. Dyno Nobel, Inc.*, Civil No. 19-5031.

FOR THE U.S. ENVIRONMENTAL PROTECTION AGENCY:

1.27.2020
_____
Date

LESLIE HUMPHREY
Acting Regional Counsel
U.S. Environmental Protection Agency, Region 7

1/23/2020
_____
Date

ELIZABETH HUSTON
Senior Assistant Regional Counsel
U.S. Environmental Protection Agency, Region 7
Office of Regional Counsel

1/27/2020
_____
Date

JAMES B. GULLIFORD
Regional Administrator
U.S. Environmental Protection Agency, Region 7

25

THE U.S. ENVIRONMENTAL PROTECTION AGENCY enters into this Consent Decree in the matter of *United States v. Dyno Nobel, Inc.*, Civil No. 19-5031.

FOR THE U.S. ENVIRONMENTAL PROTECTION AGENCY:

2/11/20
Date

SUSAN PARKER BODINE
Assistant Administrator
Office of Enforcement and Compliance Assurance
U.S. Environmental Protection Agency

2/6/20
Date

ROSEMARIE KELLEY
Director
Office of Civil Enforcement
Office of Enforcement and Compliance Assurance
U.S. Environmental Protection Agency

2/3/20
Date

MARK POLLINS
Director
Water Enforcement Division
Office of Civil Enforcement
Office of Enforcement and Compliance Assurance
U.S. Environmental Protection Agency

1/23/20
Date

JEFFREY SPEIR
Attorney-Adviser
Water Enforcement Division
Office of Civil Enforcement
Office of Enforcement and Compliance Assurance
U.S. Environmental Protection Agency

26

FOR DEFENDANT DYNO NOBEL, INC.:

1/21/20
Date

JEFFREY DROUBAY
Senior Vice President Legal and Business Affairs
Dyno Nobel Americas

1/21/20
Date

MICHAEL A. ZODY
Parsons Behle & Latimer

27

# Appendix A

# PROCEDURE

**DYNO**
**Dyno Nobel**

| Title: | **OPERATION BOILER DISCHARGE PH CONTROL SYSTEM** |
|---|---|

**1.0** <u>**SCOPE**</u>

1.1. This document provides the procedure for the operation of the Dyno Nobel boiler wastewater discharge pH control system. This system is designed to capture boiler blowdown wastewater prior to discharge from the two boilers in current operation at the Dyno Nobel Site, stabilize to neutral pH within an acceptable range, and discharge in controlled batches.

**2.0** <u>**REQUIREMENTS**</u>

2.1. All personnel assigned to this operation are responsible for knowing and adhering to this procedure and to the documents specified in Section 3; Applicable Documents.

**3.0** <u>**APPLICABLE DOCUMENTS**</u>

3.1. PRO-DNNA-CAMO-SAFE.0007: Emergency Action Plan

3.2. PRO-DNNA-CAMO-SAFE.0009: Safety Rules and Instructions

3.3. System Drawing CMFA-1251

3.4. System Schematic PHNS-4114

**4.0** <u>**MATERIALS AND EQUIPMENT**</u>

4.1. Materials: 304SS tank, Polypropylene acid line, Polypropylene/PTFE acid pump.

4.2. Denitrated Sulfuric Acid (DSA, ~70%). Piped from NAR process from DSA Storage Tank.

4.3. Refer to drawing CMFA-1251

**5.0** <u>**HEALTH, SAFETY & ENVIRONMENT**</u>

5.1. PPE Requirements

5.1.1. During normal operations, the plant approved uniform shall be worn when performing routine checks.

- Approved plant uniform shall consist of safety glasses, steel toed boots, and long pants.

5.1.2. In the event of an acid leak, operator shall don the provided acid resistant uniform and approved safety shoes.

- Acid resistant uniform shall consist of PVC coat and pants, hard hat with face shield, and acid resistant rubber boots.
- The nearest safety shower/eye wash is located by the Superior Boiler DA tank.
- Spill kit is located inside the boiler building near the DA tank. In case of a spill, notify supervision immediately.

5.2.    The area around process equipment storage tanks shall be kept clear of debris, materials, and vegetation.

5.3.    The boiler wastewater discharge pH control system requires systematic inspection, documentation and maintenance so defects may be detected and corrected before they can lead to an emergency or process upset condition.

**6.0    OPERATIONS**

6.1.    **Initial Startup**: Pre-Start Inspection

6.1.1.    Physical Check

6.1.1.1.    Ensure that the control systems and displays are operating properly.

6.1.1.2.    Check that the associated piping is free of leaks.

6.1.1.3.    Ensure that the secondary containment structure is in good condition and free of leaks.

**6.2.    Normal Operations**

**Note:** During normal operation, blowdown and condensate discharge is collected by Tank T-001 .  Blowdown pH is roughly expected to be between 10-12.

**Note:** There are separate discharge lines from each boiler.

6.2.1.    The pressurized discharge is piped into T-001 and diffused allowing the condensate to collect and hot vapor to diffuse into the atmosphere.

6.2.2.    Condensation collects in the tank and a minimum level of 30% is maintained in the tank. This level is sufficient to maintain mixer operation continuously agitating the condensate.

6.2.3.    High level in T-001 is protected and 4" tank overflow into containment.  T-001 is well vented to atmosphere through 8" vent and 4" overflow and therefore cannot be over pressurized.

6.2.4.    pH and temperature are monitored by instrumentation at the tank which is installed near the discharge point from the tank T-001.

6.2.5.    As level Increases in tank T-001, Sulfuric Acid (70%) from the NAR facility is metered in short intermittent doses.

6.2.6.    Sulfuric acid is provided from the NAR facility by a small Kynar diaphragm pump with minimal pressure used to overcome elevation and feed system at Boiler House Location.

6.2.6.1.    Sulfuric acid is supplied through ½" continuous polypropylene tube ran in overhead structure and jacketed by 2" carbon steel pipe.

6.2.7.    As sulfuric acid is added to the accumulated condensate, the process of reducing the pH into an acceptable range collects above the minimum acceptable level and the pH remains stable as indicated by instrumentation. Collected material will be released into a sump basin

6.2.8.    The water level in T-001 is permitted to decrease until the minimum acceptable level for mixer

operation at which time the valve will close, and the level will begin to increase. pH will begin to increase, and the process will start over.

Process to adjust pH in Tank 001.

- Water is collected until level reaches 50%

- Sulfuric acid is added incrementally until pH is between 7.0 and 8.5

- If sulfuric acid is not being added, and no system alarms, water is discharged from outlet valve.

- When water reaches 40%, tank discharge valve closes.

### 6.3. Temporary Operations

6.3.1. In the event sulfuric acid is not available through normal means, a local supply will be added manually for neutralization. A 55-gallon drum of ~70% sulfuric acid can be used.

6.3.2. Twice per year the boilers are drained to be inspected and to perform routine maintenance. In this situation, the water from the boilers will be pumped through a separate line to T-001. Water treatment will continue in the same manner, however; this water will be allowed to accumulate to higher level (>50%). In no circumstances shall water be allowed to collect greater than the high level alarm (90%).

**NOTE:** Only one boiler is inspected at any one time allowing for sufficient volume in the T-001 to accumulate the volume of one boiler. The approximate usable volume of T-001 is 5,900 gallons.

6.3.3. T-001 can be drained if necessary to conduct routine maintenance using manual control and monitoring via a tank drain. While in normal operation, the tank drain will be locked closed to prevent accidental out-of-specification discharge.

### 6.4. Emergency Operations

6.4.1. The acid line from NAR is monitored by a sensor to detect leaks in the line should they occur, which will shut down the system automatically and initiate an alarm condition. The boiler operators should contact plant maintenance should this occur. In the event an acid leak should be found in the containment area, the boiler operators should shut down the treatment system and notify maintenance. They should also contact the Mixed Acid operators to lock out the acid pump on the NAR USA tank, to stop the flow of acid.


| Title: | **OPERATION BOILER DISCHARGE PH CONTROL SYSTEM** |
|---|---|

### 6.5. Normal Shutdown

6.5.1. Lock out boiler blowdown valves for Keeler and Superior Boilers.

6.5.2. Shut down neutralization system by pressing the "Auto" button on control screen. This shuts down the automatic functions of the control system.

### 6.6. Startup Following a Normal Shutdown

6.6.1. Perform initial startup per section 6.1 Place system in automatic mode on the control screen.

6.6.2. Remove locks and open blowdown valves.

### 6.7. Operating Limits and Consequences of Deviation

| Equipment | Tag | Parameter | Value or Range | Indication/ Protection | Consequences of Deviation | Steps to Correct or Avoid |
|---|---|---|---|---|---|---|
| PHNS Tank | T-001 | Water Level - High | 90% | PLC control | Overflow into containment | Cease Blowdown until level is in operating range |
| PHNS Tank | T-001 | Water Level - Low | 30% | PLC control | Poor mixing of water | Inspect system for leaks or abnormalities |
| PHNS Tank | T-001 | pH | >9.0 | PLC control | potential release of high pH water | Add 70% sulfuric until pH in range |
| | | | 6.5-9.0 | PLC control | pH out of range | control range 7.0 to 8.5 |
| | | | <6.5 | PLC control | potential release of low pH water | Add NaOH to system manually until pH in range. Contact environmental department or engineering to assist in addition. |
| PHNS Tank | T-001 | Temperature | max 180 deg F | PLC control | Tank material damage over high limit | PLC adds plant water above 165 deg |

# Appendix B

# PROCEDURE



| Title: | **OPERATION OF CARBON FILTRATION SYSTEMS** |
|--------|---------------------------------------------|

**1.0     SCOPE**

1.1.   This document provides the procedure for the operation of the Dyno Nobel carbon filtration systems for laundry wastewater and air conditioner condensate at the Carthage, MO plant.

**2.0     REQUIREMENTS**

2.1.   All personnel assigned to this operation are responsible for knowing and adhering to this procedure and to the documents specified in Section 3; Applicable Documents.

**3.0     APPLICABLE DOCUMENTS**

3.1.   PRO-DNNA-CAMO-SAFE.0007:  Emergency Action Plan

3.2.   PRO-DNNA-CAMO-SAFE.0009:  Safety Rules and Instructions

**4.0     MATERIALS AND EQUIPMENT**

4.1.   Condensate pumps

4.2.   5-gallon carbon containers

4.3.   55-gallon carbon containers

4.4.   Particulate filters

**5.0     HEALTH, SAFETY & ENVIRONMENT**

5.1.   PPE Requirements

5.1.1. Safety glasses, safety toe shoes, plant uniform

5.2.   The area around process equipment shall be kept clear of debris, materials, and vegetation.

**6.0     OPERATIONS**

6.1.   **Initial Startup**: Pre-Start Inspection

6.1.1. Physical Check

6.1.1.1.    Ensure that there are no leaks anywhere in the system

6.1.1.2.    Ensure that all gauges are functioning properly

# PROCEDURE


| Title: | **OPERATION OF CARBON FILTRATION SYSTEMS** |
|---|---|

6.2. **Normal Operations**

6.2.1. Air conditioner condensate gravity feeds into the condensate pump and pumps through the 5-gallon carbon filtration system.

6.2.2. Treated condensate discharges from the outlet of the 5-gallon carbon filtration system.

6.2.3. Laundry water collects in the holding tank and is pumped into the overhead tank, which gravity feeds through the 55-gallon carbon drums

6.2.4. Carbon drums are installed with two parallel lines, each parallel line has two filters in series

6.2.5. Water flowing through the carbon filters shall be sampled by lab or environmental personnel once a month at the following locations:

6.2.5.1. Laundry Inlet LWWF-4113 XV-010 and Outlet Line #4

6.2.5.2. Laundry Inlet LWWF-4113 XV-011 and Outlet Line #2

6.2.5.3. Cast Booster Melt Pour HVAC Unit Inlet and Outlet

6.2.5.4. Cast Booster Chiller HVAC Unit Inlet and Outlet

6.2.5.5. Cast Booster Box End HVAC Unit Inlet and Outlet

6.2.6. Samples shall be sent for third party analysis to determine explosives concentration for TNT, PETN, NG, and EGDN.

6.2.7. The total explosives concentration must be reduced by 90% to indicate effective filtration. If the reduction is less than 90%, a duplicate sample must be collected within the next business day.

6.2.8. If duplicate samples indicate that the required reduction is not met, contact environmental department to change out carbon.

6.2.9. Carbon shall be subject to a hazardous waste determination and properly disposed in accordance with that determination.

# Task Report (Full List)

| | | |
|---|---|---|
| **Site** | CAMO | |
| **Task No.** | PETN-W-COND FILTER | |
| **Description** | Weekly PM of Cast Booster Condensate Filter Systems | |
| **Assigned To** | PETNMECH | **Priority** 2.00 |
| **WO Type** | PM | **Multitask** Yes |
| **Expense Class** | 10328147 | **In-service Task** Yes |

| Craft | Crew Size | Estimated Labor Hours |
|---|---|---|
| | | |

**Equipment No.** CBBE-1123-CFS-001
**Equipment Description** Condensate Filtration System

| | | |
|---|---|---|
| **Location** Cast Booster Box End | **Perform Every** 1.00 | Week(s) |
| **Sub-location 1** - | **Schedule Type** Fixed | |
| **Sub-location 2** - | **Task Duration** 2.00 | |
| **Sub-location 3** - | **No. of Times Completed** | |
| **Date Last Performed** 12/6/2019 | **Down Time** | |
| **Next Due Date** 12/13/2019 | **Must Be Down** No | |
| **Tenant** | | |

**Equipment No.** CBPR-1121-CFS-001
**Equipment Description** Condensate Filtration System

| | | |
|---|---|---|
| **Location** Cast Booster Production | **Perform Every** 1.00 | Week(s) |
| **Sub-location 1** Upstairs | **Schedule Type** Fixed | |
| **Sub-location 2** - | **Task Duration** | |
| **Sub-location 3** - | **No. of Times Completed** | |
| **Date Last Performed** | **Down Time** | |
| **Next Due Date** 12/13/2019 | **Must Be Down** No | |
| **Tenant** | | |

**Equipment No.** CBPR-1121-CFS-002
**Equipment Description** Condensate Filtration System

| | | |
|---|---|---|
| **Location** Cast Booster Production | **Perform Every** 1.00 | Week(s) |
| **Sub-location 1** Downstairs | **Schedule Type** Fixed | |
| **Sub-location 2** - | **Task Duration** | |
| **Sub-location 3** - | **No. of Times Completed** | |
| **Date Last Performed** | **Down Time** | |
| **Next Due Date** 12/13/2019 | **Must Be Down** No | |
| **Tenant** | | |

| Meter Name | Last Performed At |
|---|---|
| | |

## Task Instructions

| Instruction Code | PPE | Date Last Edited | 8/3/2016 |
|---|---|---|---|

PPE SHOULD BE WORN AT ALL TIMES!

**Weekly PM/Inspection of Cast Booster Condensate Filters**

1. Box House AC Unit Condensate Filter System PM Checklist
   - ☐ Check condensate filter for leaks
   - ☐ Check filter hose for leaks
   - ☐ Check filter box for leaks
   - ☐ Verify that condensate pump is operational (Press the "Push to Drain" button)
   - ☐ Check fittings for loose connections

   *Comments/Findings:*

2. Comfort Air/Chiller Unit Condensate Filter System PM Checklist
   - ☐ Check condensate filter for leaks
   - ☐ Check filter hose for leaks
   - ☐ Check filter box for leaks
   - ☐ Verify that condensate pump is operational (Press the "Push to Drain" button)
   - ☐ Check fittings for loose connections

   *Comments/Findings:*

3. Upstairs Melt/Pour AC Unit Filter System PM Checklist
   - ☐ Check condensate filter for leaks
   - ☐ Check filter hose for leaks
   - ☐ Check filter box for leaks
   - ☐ Check fittings for loose connections

   *Comments/Findings:*

## Powerhouse Blowdown Neutralizaton System/Carbon Filtration - Daily Inspection Checklist

Walk thru the boiler blowdown and carbon filtration systems and check equipment for abnormal conditions - leaks, damage, corrosion, etc.
Check PHNS Control Panel Alarm History and Trend Lines for Normal Operation.
Check the "Yes/No" boxes below, and if an abnormal condition is found, note it in the area provided and issue a Maintenance Repair Work Request.
Keep sheets on file in the Powerhouse Control Room.

| DATE | Operator Initials | Control Panel Operation Normal | | Treatment Tank in Good Condition | | Keeler Blowdown Pipe Lines Good | | Superior Blowdown Pipe Lines Good | | DSA Acid Line Good | | carbon filtration without leaks | | redundent pressure gages on carbon pre-filters readings consistent | | Record Abnormal Conditions - Issue Maintenance Repair Request |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Yes | No | Yes | No | Yes | No | Yes | No | Yes | No | Yes | No | Yes | No | |
| | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | |

# Appendix 5



A = Cast Booster Building
B = Dope Building
C = Chub Emulsion Building
D = Paperwrap Building

A

B

C

D

FIG 2.2
FIG 2.3
FIG 2.4
FIG 2.5

NORTH

CHECKED BY:
A. SAPPINGTON

E.W.I. # 150545
DRAWN BY: ARK
Aug. 18, 2015

SCALE IN FEET

0    250    500

APPROXIMATE

ENVIRONMENTAL WORKS

Springfield Office Location:
1455 E. Chestnut Expressway
Springfield, MO  65802
Phone: (417) 890-9500

SITE DIAGRAM
AREA ENLARGEMENT

DYNO NOBEL
17562 GUM ROAD
CARTHAGE, JASPER COUNTY, MISSOURI

FIGURE

2.1

Imagery Date: